## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### (Northern Division)

| | |
|---|---|
| BROCK ANDERSEN, derivatively on behalf of UNDER ARMOUR, INC.<br>24454 Kathleen Dr.<br>Laguna Niguel, CA 92677<br><br>-and-<br><br>BALRAJ PAUL, derivatively on behalf of UNDER ARMOUR, INC.<br>1530 Vicksburg Drive<br>Parma, Ohio 44134<br><br>Plaintiffs,<br><br>v.<br><br>KEVIN A. PLANK<br>1014 Greenspring Valley Road<br>Lutherville, Maryland 21093<br>Baltimore County<br><br>BRAD DICKERSON<br>15 Eve Lane<br>Rye, New York 10580<br><br>GEORGE W. BODENHEIMER<br>95 Hemlock Hill Road<br>New Canaan, Connecticut 06840<br><br>DOUGLAS E. COLTHARP<br>2736 Abingdon Road<br>Mountain Brook, Alabama 35243<br><br>JERRI L. DEVARD<br>15 Walker Avenue 251<br>Sag Harbor, New York 11963<br><br>KAREN W. KATZ<br>4369 San Carlos Street<br>Dallas, Texas 75205 | Case No.:<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br><u>DEMAND FOR JURY TRIAL</u> |

A.B. KRONGARD
1400 West Seminary Avenue
Lutherville Timonium, Maryland 21093
Baltimore County

ERIC T. OLSON
124 Country Club Circle SW
Lakewood, Washington 98498

HARVEY L. SANDERS
355 Wheatley Road
Old Westbury, New York 11568

LAWRENCE P. MOLLOY
225 Liberty Lake Dr.
Vestavia, Alabama 35242

      -and-

THOMAS J. SIPPEL
14601 Gallant Fox Lane
North Potomac, Maryland 20878
Montgomery County

              Defendants,

      -and-

UNDER ARMOUR, INC.,
a Maryland corporation,
1020 Hull Street, 3rd Floor
Baltimore, Maryland 21230
Baltimore City County

              Nominal Defendant.

Plaintiffs Brock Andersen ("Andersen") and Balraj Paul ("Paul") (collectively, "Plaintiffs"), by and through their respective undersigned counsel, bring this shareholder derivative action on behalf of Nominal Defendant Under Armour, Inc. ("Under Armour" or the "Company"), against certain current and former officers and directors of the Company for breaches of fiduciary duties, insider selling, and unjust enrichment.

The allegations in this verified shareholder derivative complaint (the "Complaint") are made upon personal knowledge as to those allegations concerning themselves and, as to all other matters, upon the investigation of Plaintiffs' counsel. That investigation includes, among other things: (a) review and analysis of public filings made with the United States Securities and Exchange Commission (the "SEC") by Under Armour and other related parties; (b) review and analysis of press releases and other publications disseminated by the Individual Defendants (defined below) and other related non-parties; (c) review of news articles, shareholder communications, and postings on Under Armour's website concerning the Company's public statements; (d) pleadings, papers, and documents filed with, and publicly available from, the related pending consolidated securities fraud class action, *In re Under Armour Securities Litigation*, No. 17-cv-00388-RDB (D. Md.) (the "Securities Class Action"); and (e) review of other publicly available information concerning Under Armour and the Individual Defendants.

## I.      NATURE AND SUMMARY OF THE ACTION

1.      Under Armour is one of the largest sports apparel companies in the United States and worldwide. The Company develops, markets, and distributes branded performance apparel, footwear, and accessories for men, women, and youth.

2.      The Company's primary focus is apparel, which accounts for over two-thirds of its net revenues. The Company's primary market is North America, which accounts for over three-

quarters of its sales.  The Company's primary channel is wholesale, with nearly two-thirds of the Company's sales made through wholesale channels such as sporting goods chains (*e.g.*, Finish Line, Champs, Foot Locker, Sports Authority, and Dick's Sporting Goods ("Dick's")).

3.      The athletic apparel industry is highly competitive.  The Company's chief rivals are widely-recognized and longtime industry-leading brands—Nike and Adidas.  Since its formation in 1996, Under Armour has sought to compete by capitalizing on a premium brand image and a reputation for state-of-the-art fabrics designed to enhance athletic performance.  In 2014, Under Armour became the number two sportswear brand (by revenue) in the United States, surpassing Adidas, and seemed poised to challenge Nike, the top brand in the country.

4.      From the second quarter of 2010 ("Q2 2010") to the third quarter of 2016 ("Q3 2016"), Under Armour reported a compounded annual growth rate of 20% or more.  The Company's CEO, Chairman of the Board, and founder, Defendant Kevin A. Plank ("Plank"), routinely reminded investors of this fact—as well as the fact that only one other company in the S&P 500 shared this growth rate—and consistently assured the public that such growth would continue.

5.      The Relevant Period[1] begins on July 24, 2014, when, in an apparent effort to raise the Company's profile and brand recognition to compete with established, competing sporting goods companies such as Nike, Adidas, and Reebok, the Individual Defendants began causing the Company to issue false and misleading statements regarding its vitality, continuing growth, and revenues.  Specifically, beginning on July 24, 2014, the Individual Defendants caused the Company to issue statements assuring investors that the financial difficulties of one of the Company's critical wholesale retailers and distributors of Under Armour products—Sports

---

[1] The "Relevant Period" is defined as July 24, 2014 through the present.

Authority—would not materially impact Under Armour's growth.  These misrepresentations had the effect of artificially inflating the price of Under Armour's stock[2] by materially misleading the investing public as to the true impact of Sports Authority's financial difficulties and the financial condition of the Company.

6.      The Individual Defendants thereafter caused the Company to make numerous other false and misleading statements regarding its business model, prospects, and business practices. For example, during the Company's Investor Day held September 16, 2015 (the "2015 Investor Day"), Plank boasted that "[t]he demand for our brand has never been stronger," and the Individual Defendants further led the market to believe that the Company's incredible growth streak would continue.  The Individual Defendants projected that net revenue would grow 25% in 2016, and that the Company would achieve $7.5 billion in annual revenue and $800 million in annual operating income by 2018.  This exceptionally aggressive outlook doubled the 2015 annual results ($3.84 billion in revenue and $405 to $408 million in operating income) projected by the Individual Defendants at that time.  In truth, the Company's incredible historic growth rate had already begun to decline.  Customer demand for the Company's core products had already begun to diminish. As later admitted by the Individual Defendants, the Company failed to compensate for this decline by offering new products consistent with the latest consumer trends, such as athletic leisure

---

[2] The Company has three classes of common stock.  Class A Common Stock is publicly traded (NYSE: UAA) and carries one vote per share.  Class B Common Stock is non-publicly traded, carries ten votes per share, and automatically converts to Class A Common Stock when Plank beneficially owns less than 15% of the total shares of Class A and Class B Common stock outstanding, and in other limited circumstances.  Class C Common Stock is publicly traded (NYSE: UA) and carries no voting rights except in limited circumstances.  Shares of Class C Common Stock were first issued after the close of trading on April 7, 2016, by way of a one-for-one stock dividend to all holders of record of Class A and Class B Common Stock as of March 28, 2016.

apparel.  As a result, the Company's apparel sales began to slow, ceding market share to Nike and Adidas.

7.      The Company responded by abandoning its fundamental sales philosophy of competing based on the strength of its brand rather than the competitiveness of its product pricing. Indeed, the Company resorted to drastically lowering sales prices, offering promotions, and liquidating excess inventory at steep discounts.  This contributed to a drop in the Company's average sales prices ("ASPs") even while the Company's competitors, including Nike, were steadily increasing ASPs.

8.      As the Company's apparel sales problems worsened—and its revenue and operating income growth slowed and its margins compressed—the Individual Defendants grew unable to continue concealing the truth.  A series of partial disclosures revealed issues with Under Armour that the Individual Defendants had previously concealed, causing a series of sharp declines in the value of Under Armour's securities.  Nonetheless, the Individual Defendants curtailed these declines by artificially inflating the Company's securities prices throughout the Relevant Period, downplaying negative news, and continuing to mislead the market with misrepresentations and omissions regarding the Company's financial condition.

9.      On January 10, 2016, Morgan Stanley published an analyst report (the "Morgan Stanley Report") questioning the Company's growth, average sales prices, market share, and margins, downgrading its sales and earnings per share ("EPS") forecasts for the Company, and drastically reducing its price target for the Company's stock from $103 to $62 per share.  The Morgan Stanley Report detailed various of the Company's key issues, including a slowdown in its North American apparel business that had been occurring *since at least the spring of 2015*, sharp declines in its sales of women's apparel, and significant decreases in its footwear prices (relative

to industry decreases) since 2013.  The Morgan Stanley Report resulted in a sharp decline in Under Armour securities.  However, to minimize these declines, and to preserve the Company's carefully cultivated image as a fast-growing, cutting-edge sports brand and legitimate challenger to Nike, the Individual Defendants downplayed the Morgan Stanley Report, and otherwise concealed these issues.

10.     Rather than explaining to the market that "brand heat" for the Company's apparel was dying, the Individual Defendants falsely claimed, and reassured investors, that the Company's apparel, and its financial results and prospects, were as strong as ever.  The Individual Defendants trumpeted explosive growth and strong customer demand while downplaying and concealing the Company's ballooning inventory, liquidations, and gross margin compression.  Incredibly, despite these negative trends afflicting the Company's core business, the Individual Defendants caused the Company to *raise* guidance, on April 21, 2016, for fiscal year 2016 ("FY 2016") net revenues and operating income.  Additionally, to temporarily sustain revenue growth, distract investors, and provide a scapegoat for the Company's margin declines, the Individual Defendants caused the Company to accelerate investments in lower margin footwear products and international expansion.

11.     On May 31, 2016, the Individual Defendants finally revealed that the bankruptcy and liquidation of Sports Authority would cause the Company to recognize an impairment charge of approximately $23 million in the second quarter of 2016 ("Q2 2016").  In response, the Company's Class A Common Stock declined from its closing price of $37.73 on May 31, 2016, to a closing price of $36.25 on June 1, 2016, a decline of over 3.92% ($1.48 per share), resulting in a loss of over $271 million in market capitalization.  The Company's Class C Common Stock likewise fell on this news, from a closing price of $34.97 at the close of trading on May 31, 2016

to $33.72 at the close of trading on June 1, 2016, representing a decline of 3.57% ($1.25 per share), and resulting in a loss of over $274 million in market capitalization.

12.     Yet even after the truth regarding Sports Authority and its impact on Under Armour began to be revealed, the Individual Defendants continued causing the Company to issue statements both minimizing the impact of Sports Authority's bankruptcy filing and assuring investors that the Company's growth would continue, and its revenues would rise. These false and misleading statements continued until at least January 31, 2017, when the Individual Defendants caused the Company to issue a press release (the "January 31, 2017 Press Release") announcing financial results that were significantly below the guidance previously issued in October 2016. The January 31, 2017 Press Release further announced that Defendant Lawrence P. "Chip" Molloy ("Molloy"), the then-CFO of Under Armour, would be resigning his position "due to personal reasons" after serving only 13 months as CFO and receiving total compensation of approximately $6.7 million from the Company in 2016.

13.     On this news, the Company's Class A Common Stock price plunged to new lows, falling from its closing price of $28.94 on January 30, 2017, to close at $21.49 on January 31, 2017, a one-day drop of approximately 26%, resulting in a loss of approximately $1.37 **billion** in market capitalization. The Company's Class C Common Stock likewise tumbled on this news, dropping 23.40% ($5.87 per share) in a single trading day, from a closing price of $25.09 per share on January 30, 2017, to close at $19.22 per share on January 31, 2017, resulting in a loss of approximately $1.3 **billion** in market capitalization.

14.     The Company's stock prices continued to decline, with the price of its Class A Common Stock closing at only $11.61 on November 3, 2017, and its Class C Common Stock closing at just $10.59 on November 3, 2017, resulting in a total loss of a staggering ***$16.8 billion***

combined in market capitalization (*i.e.*, investors' funds), as compared to the Relevant Period high for the Company's stock of $52.05 on September 17, 2015.[3]

15.     Meanwhile, while the Company's securities were artificially inflated as a result of the Individual Defendants' wrongful conduct, several of the Individual Defendants misappropriated their insider knowledge to sell personally-held Under Armour securities for massive gains.  Plank personally cashed in on such artificial inflation by unloading ***over 4.7 million shares*** of his Company stock for total proceeds of ***over $328.5 million*** during the Relevant Period. Plank's sales were suspiciously timed, with a large portion of these sales—900,000 shares sold (*i.e.*, 18.9% of total shares Plank sold during the Relevant Period) for total proceeds of approximately $38.3 million (*i.e.*, 11.7% of total proceeds from shares Plank sold during the Relevant Period)—occurring ***within just eight days*** after the Company raised guidance on April 21, 2016.  Several of the other Individual Defendants also took advantage of the Company's artificially inflated stock price to sell a combined 73,907 shares of their personally-held Company stock for total proceeds of approximately $4,182,354.38.

16.     As a result of the events described herein, Under Armour has become the subject of the Securities Class Action, which was filed on June 10, 2017.  On August 9, 2017, the lead plaintiffs in the Securities Class Action (the "Securities Plaintiffs") filed the Corrected Consolidated Amended Complaint for Violations of the Federal Securities Laws (the "Securities Complaint").  The "Class Period" in the Securities Class Action is defined as September 16, 2015 through January 30, 2017, inclusive.  The Securities Class Action asserts claims on behalf of purchasers of Under Armour securities during the Class Period, as well as separate claims on behalf

---

[3] The prices of Class C Common Stock on or before April 7, 2016 referenced herein have been adjusted to account for Under Armour's stock dividend after the close of trading on April 7, 2016.

of purchasers and acquirers of 3.250% senior unsecured notes of Under Armour due June 15, 2026 ("Notes" or "Bonds") pursuant or traceable to the Company's Registration Statement on Form S-3ASR, which was filed with and declared effective by the U.S. Securities Exchange Commission ("SEC") on June 6, 2016 ("Registration Statement").  All except one individual named as a defendant in the Securities Class Action—*i.e.*, Plank, George W. Bodenheimer ("Bodenheimer"), Douglas E. Coltharp ("Coltharp"), Karen W. Katz ("Katz"), A.B. Krongard ("Krongard"), Eric T. Olson ("Olson"), and Harvey L. Sanders ("Sanders") (collectively, the "Individual Securities Class Action Defendants")[4]—are also named herein as Individual Defendants.

17.     In accordance with Maryland law,[5] on July 5, 2017, Plaintiffs made a written demand on Under Armour's Board of Directors (the "Board") to investigate and, if warranted, take necessary legal action against those responsible for the damages the Company has suffered in connection with the events underlying the Securities Class Action (the "Demand").

18.     As discussed in detail below, the Board's investigation and response (or lack thereof) to the Plaintiffs' Demand was wrongful and unreasonable under Maryland law.

19.     A review group of the Board comprised of Defendants Olson and Bodenheimer ("Review Group") purportedly investigated and issued a report to the Board, which purportedly: (i) found no evidence supporting the Demand's allegations; and (ii) recommended that the Board decline to pursue any claims.  According to a November 10, 2017 letter sent to Plaintiffs on behalf of the Company by the law firm Fried, Frank, Harris, Shriver & Jacobson LLP ("FFHSJ"), a majority of purportedly "disinterested and independent directors voted to adopt the findings and

---

[4] The only Individual Defendant not named as a defendant in the Securities Class Action is Jerri L. DeVard ("DeVard"), whose service as a Director of the Company began in May 2017—*i.e.*, four months beyond of the end of the Class Period asserted in the Securities Class Action.

[5] Under Armour is a Maryland corporation.

recommendations" in the report on November 6, 2017.  On January 11, 2018, Plaintiffs sent a follow-up communication to the Board requesting that the Board, and its purported review committee, confirm that—as evident from the report issued to the Board purportedly in response to Plaintiffs' Demand—the factual allegations detailed in the Securities Complaint were not considered or addressed by the Review Group or the Board in refusing to pursue claims against the Individual Defendants.  The Board's response entirely failed to address Plaintiffs' concerns, and instead merely reaffirmed its prior determination to refuse Plaintiffs' Demand.

20.     The Board and the Review Group have failed to act independently, in good faith, and within the realm of sound business judgment in investigating and denying the Demand.  In light of the Board's unreasonable and wrongful refusals of Plaintiffs' Demand to investigate and remediate harms caused to the Company, Plaintiffs have filed this action alleging violations of Section 14(a) of the Exchange Act, breach of fiduciary duties, insider selling, and unjust enrichment.  Because the Board's response to the Demand was improper and directly at-odds with the Board's fiduciary duties, as detailed further herein, this derivative action should be permitted to proceed.

## II.     JURISDICTION AND VENUE

21.     The Court has jurisdiction over all claims pursuant to 28 U.S.C. § 1332(a)(2), in that Plaintiffs and Defendants are citizens of different states, and the matter in controversy exceeds $75,000, exclusive of interests or costs.  The Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

22.     The Court has jurisdiction over each Defendant because each Defendant is either a corporation that does sufficient business in Maryland or is an individual who has sufficient

minimum contacts with Maryland so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

23.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because many of the acts and practices complained of herein occurred in this District, and the Company conducts business and maintains its headquarters in this District.

24.     In connection with the acts and conduct alleged herein, the Individual Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities exchanges and markets.

## III.     THE PARTIES

### A.     Plaintiffs

25.     Plaintiff Andersen has continuously held Under Armour stock since April 2014 and is a citizen of Utah.

26.     Plaintiff Paul has continuously held Under Armour stock since March 2014 and is a citizen of Ohio.

### B.     Nominal Defendant

27.     Nominal Defendant Under Armour is a corporation incorporated under Maryland law, with principal executive offices located in Baltimore, Maryland.  The Company's common stock is traded on the New York Stock Exchange under the ticker symbols "UA" and "UAA."  The Company currently has more nearly 408 million combined shares of common stock outstanding, including over 224 million shares of UA, and over 185 million shares of UAA.

C.      **Individual Defendants**

28.      Defendant Plank is the founder of the Company and has been the Company's CEO and Chairman of the Board since the Company's formation in 1996 through the present.  Plank is the Company's largest shareholder, beneficially owning approximately 15% of all shares outstanding and controlling approximately 65% of the voting shares.  Plank has received a total of $12,058,315 in compensation from the Company since 2014, including $3,556,190 in 2014, $2,434,209 in 2015, $2,033,575 in 2016, and $4,034,341 in 2017.  During the Relevant Period, while in possession of material, non-public information, Plank sold at least 4,770,000 personally-held shares of Under Armour stock at artificially-inflated prices for proceeds of approximately $328,516,281.31.  The Company acknowledges that Plank is not an independent director.  Plank is a defendant in the Securities Class Action.  Plank is a citizen of Maryland.

29.      Defendant Bodenheimer has been a Director of the Company since August 2014.  During the Relevant Period, he has served as a member of the Compensation Committee.  Bodenheimer has received a total of $708,750 in compensation from the Company since 2014, including $83,750 in 2014, $200,000 in 2015, $200,000 in 2016, and $225,000 in 2017.  Bodenheimer is a defendant in the Securities Class Action.   Bodenheimer is a citizen of Connecticut.

30.      Defendant Coltharp has been a Director of the Company since December 2004.  During the Relevant Period, he has served as a member of the Audit Committee and the Chairman of the Finance and Capital Planning Committee.  Coltharp has received a total of $793,578 in compensation from the Company since 2014, including $137,500 in 2014, $215,000 in 2015, $206,078 in 2016, and $235,000 in 2017.  During the Relevant Period, while in possession of material, non-public information, Coltharp sold at least 21,743 personally-held shares of Under

Armour stock at artificially-inflated prices for proceeds of approximately $1,112,440.38. Coltharp is a defendant in the Securities Class Action. Coltharp is a citizen of Alabama.

31.     Defendant DeVard has been a Director of the Company since May 2017. DeVard received a total of $306,250 in compensation from the Company in 2017. During the Relevant Period, DeVard has served as a member of the Compensation Committee. DeVard is a citizen of New York.

32.     Defendant Katz has been a Director of the Company since October 2014. During the Relevant Period, she has served as a member of the Corporate Governance Committee and the Finance and Capital Planning Committee. Katz has received a total of $682,500 in compensation from the Company since 2014, including $57,500 in 2014, $200,000 in 2015, $200,000 in 2016, and $225,000 in 2017. Katz is a defendant in the Securities Class Action. Katz is a citizen of Texas.

33.     Defendant Krongard has been a Director of the Company since July 2005, and Lead Director since May 2006. During the Relevant Period, he has served as Chairman of the Audit Committee. Krongard has received a total of $937,500 in compensation from the Company since 2014, including $177,500 in 2014, $255,000 in 2015, $240,000 in 2016, and $265,000 in 2017. During the Relevant Period, while in possession of material, non-public information, Krongard sold at least 16,800 personally-held shares of Under Armour stock at artificially-inflated prices for proceeds of approximately $762,849.36. Krongard is a defendant in the Securities Class Action. Krongard is a citizen of Maryland.

34.     Defendant Olson has been a Director of the Company since July 2012. During the Relevant Period, he has served as a member of the Corporate Governance Committee. Olson has received a total of $755,000 in compensation from the Company since 2014, including

$130,000 in 2014, $200,000 in 2015, $200,000 in 2016, and $225,000 in 2017.   Olson is a defendant in the Securities Class Action.  Olson is a citizen of Washington.

35.     Defendant Sanders has been a Director of the Company since November 2004. During the Relevant Period, Sanders has served as a member of the Compensation Committee. Sanders has received $805,000 in total compensation from the Company since 2014, including $142,500 in 2014, $212,500 in 2015, $212,500 in 2016, and $237,500 in 2017.   During the Relevant Period, while in possession of material, non-public information, Sanders sold at least 16,800 personally-held shares of Under Armour stock at artificially-inflated prices for proceeds of approximately $760,859.40.  Sanders is a defendant in the Securities Class Action.  Sanders is a citizen of New York.

36.     Thomas J. Sippel ("Sippel") served as a Director of the Company from July 2001 until April 2015.  Thereafter, Sippel was appointed by Defendant Plank as manager of two limited liability companies (which were controlled by Plank and held significant quantities of his Under Armour shares), thereby granting Sippel voting control, and shared investment control with Plank, over shares held by the companies.  Sippel received a total of $154,792 in compensation from the Company from 2014 to 2015, including $130,000 in 2014, and $24,792 in 2015.   During the Relevant Period, while in possession of material, non-public information, Sippel sold at least 8,564 personally-held shares of Under Armour stock at artificially-inflated prices for proceeds of approximately $590,573.44.  Sippel is a citizen of Maryland.

37.     Bradley "Brad" J. Dickerson ("Dickerson") was the Company's CFO and Chief Operating Officer ("COO") from March 2008 and March 2015, respectively, until he resigned from both positions on or about January 19, 2016.  Following his resignation, Dickerson served as an advisor to the Company until February 29, 2016.  Earlier in his tenure with Under Armour,

Dickerson served as the Company's Vice President of Accounting and Finance from February 2006 to February 2008. Dickerson received a total of $3,177,755 in compensation from the Company from 2014 to 2016, including $1,514,777 in 2014, $1,553,487 in 2015, and $109,491 in 2016 until his resignation. During the Relevant Period, while in possession of material, non-public information, Dickerson sold at least 10,000 personally-held shares of Under Armour stock at artificially-inflated prices for proceeds of approximately $955,631.80. Dickerson is a citizen of Maryland.

38.     Defendant Molloy was the Company's CFO from January 2016 until he resigned as CFO effective February 3, 2017. Molloy received a total of $6,773,583 in compensation from the Company in 2016, as well as $142,329 in 2017 until his resignation. Molloy is a citizen of Alabama.

### D.     **Party Definitions**

39.     Brock Andersen and Balraj Paul are, at times, referred to collectively herein as "Plaintiffs."

40.     Defendants Plank, Bodenheimer, Coltharp, DeVard, Katz, Krongard, Olson, Sanders, Dickerson, Molloy, and Sippel are, at times, referred to collectively herein as the "Individual Defendants."

41.     Defendants Plank, Bodenheimer, Coltharp, DeVard, Katz, Krongard, Olson, Sanders, and Sippel are, at times, referred to collectively herein as the "Director Defendants."

42.     Defendants Plank, Dickerson, and Molloy are, at times, referred to collectively herein as the "Officer Defendants."

43.     Defendants Plank, Coltharp, Krongard, Sanders, Sippel, and Dickerson are, at times, referred to collectively herein as the "Insider Selling Defendants."

## IV.    SUBSTANTIVE ALLEGATIONS[6]

### A.    Overview of the Company

44.    According to its public filings, Under Armour is a developer, marketer, and distributor of branded performance apparel, including clothing, footwear, and accessories.  The Company's products are sold worldwide.  Under Armour describes its apparel as "engineered to replace traditional non-performance fabrics in the world of athletics and fitness with performance alternatives designed and merchandised along gearlines."

45.    Apparel remains the Company's core product and top revenue generator, accounting for over two-thirds of net revenue in FY 2016.  While Under Armour products are available worldwide, the Company's fortunes have always been tied to success in North America, which contributed 83% of the Company's net revenues in 2016.  Thus, North American apparel sales are critical to the Company's success.  As Plank admitted on January 31, 2017: "North American apparel is still our largest and most profitable business by far.  Accordingly, less-than-expected growth in this area disproportionately pressures our overall growth rate."

46.    Wholesale retailers are important distributors of the Company's products.  Nearly two-thirds of the Company's sales (*i.e.*, 65% in 2016) are wholesale sales to national and regional sporting goods chains (*e.g.*, Sports Authority, Dick's, Foot Locker, and Champs), independent and specialty retailers, department store chains, institutional athletic departments, and sports leagues and teams.  Under Armour also owns and operates its own retail locations and retail websites that exclusively sell Under Armour products—collectively referred to as the direct-to-consumer ("DTC") channel—which accounted for 31% of the Company's sales in 2016.

---

[6] All textual emphases in quoted material in this Complaint are added unless otherwise noted.

B.     **The Company's Aggressive Growth Strategy Begins to Falter**

47.     Although Under Armour has many competitors, including Nike, Adidas, Reebok, and other athletic brands, the Company has gained market share from these competitors, capitalizing on its premium brand image and reputation for brand performance rather than competing on price.   Indeed, by fall of 2014, Under Armour had become the number two sportswear brand according to U.S. revenue, surpassing Adidas and setting its sights on the number one brand—Nike.

48.     Since Under Armour's inception in 1996, and even after it went public in 2005, Plank has always had significant control of the Company, controlling a majority of stockholder votes, in addition to serving as CEO and Chairman of the Board, at all times.   Plank has implemented an aggressive growth strategy, brazenly targeting the Company's more-established competitors.   In 2010, for example, Plank announced the Company's foray into the basketball business (one of Nike's strongholds) by assailing Nike as "old" and declaring Under Armour's intent to become the "No. 1" brand.

49.     Within Under Armour, instructions for determining growth forecasts were very simple: take what you sold last year and add 20%.  The Company's "top down" aggression came directly from Plank.  Plank's obsession with the 20% growth streak drove the Company's revenue growth-at-all-costs strategy.  For Plank and Under Armour, the overriding objective was growth.

50.     Plank's strategy appeared to pay off.  Under Armour rode a wave of tremendous growth into the Relevant Period.  For 26 consecutive quarters (over six years) spanning from the second quarter of 2010 to Q3 2016, Under Armour reported an unwavering revenue growth rate of 20% or more (on a year-over-year basis).  Plank never missed an opportunity to remind investors

of that feat, coupled with ultra-aggressive projections and assurances that such growth would continue.

51.     During the Company's 2015 Investor Day, Plank assured investors that the Company's growth streak would continue, stating,

> We've enjoyed 21 consecutive quarters of 20-plus% revenue growth, more than five years of 20-plus% revenue growth quarter in an quarter out, delivering and finding a way and doing it not because we are pushing or pressing, because it's the demand and the app from our consumer.  We are one of only two companies in the S&P 500 that can make that claim, and we are very proud of that and what that means. And frankly, we have no expectation of that stopping anytime soon.

52.     However, despite many years of successful growth, it was apparent that the Company's product styles had grown stale and its "brand heat" (*i.e.*, customer demand) was dying down by September 2015.  The Company failed to offer new and updated products in line with the latest consumer trends.  One such trend involved athletic leisure apparel (aka "athleisure" or "lifestyle" apparel), which had exploded in popularity by the start of the Relevant Period.  Athletic leisure apparel is fashion-oriented casual wear inspired by workout clothing and is sold by many different retailers beyond the traditional sporting goods stores.   Many of the Company's competitors, particularly Nike and Adidas, cashed in on this trend by expanding their product lines to include athletic leisure apparel.  However, Under Armour failed to offer its own line of athletic leisure apparel until late in the Class Period.  Instead, the Company continued to lean heavily on the same "core basic" apparel styles it had sold for years, such as training t-shirts and hooded sweatshirts.  While historically, these products had been huge volume drivers for Under Armour, they became oversaturated as many customers already owned them in different colors and were not as interested in buying them again.  This enabled competitors to capture critical sales volume and market share from Under Armour and enhance their brand values at the expense of Under Armour.

C.   **The Individual Defendants Made or Caused the Company to Make Numerous Materially False and Misleading Statements Throughout the Relevant Period**

1.   *The Materially False and Misleading Statements Regarding Reduced Financial Guidance Resulting From the Sports Authority Bankruptcy*

53.   Beginning at the start of the Relevant Period, and continuing for over a year thereafter, the Individual Defendants made, or caused the Company to make, numerous materially false and misleading statements regarding the impacts to Under Armour that had resulted from, were resulting from, and would continue to result from, the financial difficulties and instability faced by one of the critical wholesale retailers and distributors of Under Armour products—Sports Authority.   Specifically, the Individual Defendants disregarded and downplayed, and reassured investors regarding, the foreseeable impacts of Sports Authority's financial condition on Under Armour's financial performance and business prospects, despite the fact the Individual Defendants knew or should have known of such impacts at the time of each such statement.

54.   Indeed, in June 2014, Moody's Investors Service ("Moody's") downgraded its ratings outlook for Sports Authority from stable to negative, due in part to the risk that Sports Authority would default on debt obligations due in February 2015.   Nevertheless, as Sports Authority continued to be financially unstable, the Individual Defendants continued to make false and misleading statements that disregarded and downplayed, and reassured investors regarding, the foreseeable effects that Sports Authority's financial difficulties and instability, and ultimately its bankruptcy and liquidation, would have on the Company's revenues and growth prospects.

55.   The first such false and misleading statements made, or caused to be made, by the Individual Defendants came on July 24, 2014 (the start of the Relevant Period), when the Individual Defendants caused the Company to file a current report on Form 8-K with the SEC, attaching as an exhibit a press release that was issued that same day (the "July 24, 2014 Press Release"), therein announcing Under Armour's financial and operating results for the second

quarter of 2014 ("Q2 2014").  The July 24, 2014 Press Release reported that the Company's net revenues had increased by 34% (compared with the same period in the prior year) to $610 million, and raised the Company's fiscal year 2014 ("FY 2014") net revenue outlook to a range of $2.98 billion to $3.0 billion, compared to its prior outlook of $2.88 billion to $2.91 billion.  The July 24, 2014 Press Release further raised the Company's FY 2014 operating income outlook to a range of $343 million to $345 million, compared to its prior outlook of $331 million to $334 million.  Also in the July 24, 2014 Press Release, Plank made the following statements:

> ***The broad-based momentum that we have been experiencing recently showed no signs of stopping during the second quarter***.  While we continued to add more dimension to our largest growth driver in Apparel, we were particularly encouraged by the brand response we are seeing in both our Footwear and International businesses.

Notably, however, the Individual Defendants caused the July 24, 2014 Press Release to misleadingly omit and/or disregard the then-known and foreseeable effects of Sports Authority's financial condition on Under Armour.

56.     Also on July 24, 2014, the Individual Defendants caused Under Armour to hold a conference call with investors and analysts to discuss the Company's Q2 2014 financial results (the "Q2 2014 Call"), during which Defendants Plank and Dickerson participated on behalf of the Company.  During the Q2 2014 Call, Plank characterized the Company's performance and growth in the youth market as a "massive" strategic goal, and further acknowledged the importance of its wholesale partners—specifically including Sports Authority—to achieving that goal, as follows:

> So we're learning a lot from the Youth standpoint.  The difficulty we've always found with Youth is distribution.  And where can you find appropriate distribution?  So we've been working with our key wholesale partners and expanding their footprints.  And I think you'll see that in some of our bigger players like Dick's and even creating out some Dick's and ***Sports Authority*** and some of the others.  But really I think you've seen a real commitment from our wholesale partners in saying, what can I do to attack the Youth business?  And so that's happening with us.  And frankly, there's not a lot of horses in this race either.  Kids are pretty specific with what they're looking for.  I think we're proud of the position and the leadership that

we're taking there.  So ***there's more to do on distribution and continuing to work with our partners to give us appropriate space in the stores to give those products a chance to be sold***.

However, despite mentioning Sports Authority and its importance to Under Armour's current and future performance, Plank misleadingly omitted to mention the then-known and foreseeable effects of Sports Authority's financial condition on Under Armour.

57.     On August 5, 2014, the Individual Defendants caused Under Armour to file its quarterly report on Form 10-Q with the SEC (the "Q2 2014 10-Q"), therein reiterating the Company's financial and operating results for Q2 2014, as previously discussed in the July 24, 2014 Press Release.  However, the Q2 2014 10-Q also misleadingly omitted and/or disregarded the then-known and foreseeable effects of Sports Authority's financial condition on Under Armour.

58.     The Q2 2014 10-Q contained signed certifications, pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), by Defendants Plank (in his capacity as CEO and Chairman of the Board), and Dickerson (in his capacity as CFO and COO), certifying as follows:

> 1.     I have reviewed this quarterly report on Form 10-Q of Under Armour, Inc.;

> 2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

> 3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

> 4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a.    all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b.    any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

59.    On October 23, 2014, the Individual Defendants caused the Company to file a current report on Form 8-K with the SEC, attaching as an exhibit a press release that was issued that same day (the "October 23, 2014 Press Release"), therein announcing Under Armour's financial and operating results for the third quarter of 2014 ("Q3 2014"). The October 23, 2014 Press Release reported that the Company's net revenues increased by 30% (compared with the

same period in the prior year) to $938 million, and raised the Company's 2014 net revenue outlook to $3.03 billion, from its prior outlook of $2.98 to $3.0 billion, representing growth of approximately 28% to 29% from 2013.  The October 23, 2014 Press Release also raised the Company's 2015 operating income outlook to $348 million, compared to its prior outlook of $343 million to $345 million.  Once again, however, the Individual Defendants caused the October 23, 2015 Press Release to misleadingly omit and/or disregard the then-known and foreseeable effects of Sports Authority's financial condition on Under Armour.

60.    Also on October 23, 2014, the Individual Defendants caused Under Armour to hold a conference call with investors and analysts to discuss the Company's Q3 2014 financial results (the "Q3 2014 Call"), during which Defendants Plank and Dickerson participated on behalf of the Company.  During the Q3 2014 Call, Plank emphasized the Company's focus on improving merchandizing expertise, and the benefits realized by the Company as a result, further explaining that Under Armour would be focusing such efforts on its North American wholesale partners—specifically including Sports Authority—as follows:

> *[W]e are also laser focused on improving our merchandising expertise, specifically as it relates to our wholesale partners*.  We've seen the benefit of this effort within our own direct consumer and International channels, and we will enable our North American wholesale partners including DICK'S Sporting Goods, Academy Sports, *Sports Authority*, Hibbett Sports, Cabela's, Foot Locker and the Finish Line, as well as all of our key wholesale partners around the globe to present distinct points of view on Under Armour within all their doors.

However, despite mentioning Sports Authority and its importance to Under Armour's focus on merchandizing expertise, Plank misleadingly omitted to mention the then-known and foreseeable effects of Sports Authority's financial condition on Under Armour.

61.    On November 5, 2014, the Individual Defendants caused Under Armour to file its quarterly report on Form 10-Q with the SEC (the "Q3 2014 10-Q"), therein reiterating the Company's financial and operating results for Q3 2014, as previously discussed in the

October 23, 2014 Press Release.  However, the Q3 2014 10-Q also misleadingly omitted and/or disregarded the then-known and foreseeable effects of Sports Authority's financial condition on Under Armour.

62.     The Q3 2014 10-Q contained signed certifications pursuant to SOX by Defendants Plank (in his capacity as CEO and Chairman of the Board) and Dickerson (in his capacity as CFO and COO) that were substantially similar to those identified above in ¶58.

63.     On February 19, 2015, Moody's further downgraded Sports Authority's Corporate Family Rating to Caa1 from B3, reflecting Sports Authority's "weak liquidity stemming from the need for the company to address near-term debt maturities."  Moody's also downgraded the rating on Sports Authority's $300 million senior secured term loan, which would come due on February 2, 2016 if the Company's subordinated notes remained outstanding on that date.  Moody's further noted that: "At these operating levels, Sports Authority's capital structure is unsustainable over the longer term, and the risk of a default, including a distressed exchange, is high given the upcoming maturities."

64.     The next day, February 20, 2015, the Individual Defendants caused the Company to file its annual report on Form 10-K with the SEC (the "2014 10-K"), reporting Under Armour's financial and operating results for FY 2014.  The 2014 10-K misleadingly failed to mention Sports Authority, the financial difficulties facing that company, or the foreseeable effects that such difficulties—much less its liquidation—would have on Under Armour's revenues and growth prospects.  Yet according to the "Sales and Distribution" section of the 2014 10-K, Under Armour's sales through wholesale channels, including national and regional sporting goods chains, such as Sports Authority, represented 67% of the Company's net revenues.  Thus, the Individual Defendants knew or should have known that if Sports Authority were to liquidate and cease to

function as a distributor of the Company's products, a substantial percentage of the Company's revenues would be impacted.

65.     The 2014 10-K contained signed certifications, pursuant to SOX, by Defendants Plank (in his capacity as CEO and Chairman of the Board) and Dickerson (in his capacity as CFO). In addition to Defendants Plank and Dickerson, the 2014 10-K was also signed by Defendants Bodenheimer, Coltharp, Katz, Krongard, Olson, Sanders, and Sippel, in their capacities as Directors. The SOX certifications in the 2014 10-K set forth as follows:

> 1.     I have reviewed this annual report on Form 10-K of Under Armour, Inc.;

> 2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

> 3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

> 4.     The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

>> a)     designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

>> b)     designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

        c)      evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

        d)      disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

     5.      The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

        a)      all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

        b)      any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

*     *     *

Pursuant to 18 U.S.C. Section 1350, as created by Section 906 of the Sarbanes-Oxley Act of 2002, the undersigned officer of Under Armour, Inc. (the "Company") hereby certifies, to such officer's knowledge, that:

        (i)      the annual report on Form 10-K of the Company for the period ended December 31, 2014 (the "Report") fully complies with the requirements of Section 13(a) or Section 15(d), as applicable, of the Securities Exchange Act of 1934, as amended; and

        (ii)      the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

     66.      On April 21, 2015, the Individual Defendants caused the Company to file a current

report on Form 8-K with the SEC, attaching as an exhibit a press release that was issued that same

day (the "April 21, 2015 Press Release"), therein announcing Under Armour's financial and

operating results for the first quarter of 2015 ("Q1 2015").  The April 21, 2015 Press Release

reported that the Company's net revenues increased by 25% (compared with the same period in the prior year) to $805 million, and raised the Company's 2015 net revenue outlook to $3.78 billion, from its prior outlook of $3.76 billion, representing growth of 23% from 2014.  The April 21, 2015 Press Release also raised the Company's 2015 operating income outlook to a range of $400 million to $408 million, compared to its prior outlook of $397 million to $407 million. Also in the April 21, 2015 Press Release, Plank made the following statements:

> We reached an important milestone to start 2015 with our **20th straight quarter above 20% net revenue growth.**  This represents five years of consistently exceeding the demands of our athletes and just as importantly, anticipating what those demands will be next.  **While the 25% growth achieved in the first quarter was a great start to the year, we are even more excited with the foundation we are establishing for future growth.**

However, the Individual Defendants caused the April 21, 2015 Press Release to misleadingly omit and/or disregard the then-known and foreseeable effects of Sports Authority's financial condition on Under Armour.

67.     On May 1, 2015, the Individual Defendants caused Under Armour to file its quarterly report on Form 10-Q with the SEC (the "Q1 2015 10-Q"), therein reiterating the Company's financial and operating results for Q1 2015, as previously discussed in the April 21, 2015 Press Release.  However, the Q1 2015 10-Q also misleadingly omitted and/or disregarded the then-known and foreseeable effects of Sports Authority's financial condition on Under Armour.

68.     The Q1 2015 10-Q contained signed certifications pursuant to SOX by Defendants Plank (in his capacity as CEO and Chairman of the Board) and Dickerson (in his capacity as CFO and COO) that were substantially similar to those identified above in ¶58.

69.     On July 23, 2015, the Individual Defendants caused the Company to file a current report on Form 8-K with the SEC, attaching as an exhibit a press release that was issued that same

day (the "July 23, 2015 Press Release"), therein announcing Under Armour's financial and operating results for the second quarter of 2015 ("Q2 2015").  The July 23, 2015 Press Release reported that the Company's net revenues increased by 29% (compared with the same period in the prior year) to $784 million, and raised the Company's 2015 net revenue outlook to $3.84 billion, from its prior outlook of $3.78 billion, representing growth of 25% from 2014.  The July 23, 2015 Press Release also raised the Company's 2015 operating income outlook to a range of $405 million to $408 million, compared to its prior outlook of a range of $400 million to $408 million.  Once again, however, the Individual Defendants caused the July 23, 2015 Press Release to misleadingly omit and/or disregard the then-known and foreseeable effects of Sports Authority's financial condition on Under Armour.

70.     On August 4, 2015, the Individual Defendants caused Under Armour to file its quarterly report on Form 10-Q with the SEC (the "Q2 2015 10-Q"), therein reiterating the Company's financial and operating results for Q2 2015, as previously discussed in the July 23, 2015 Press Release.  However, the Q2 2015 10-Q also misleadingly omitted and/or disregarded the then-known and foreseeable effects of Sports Authority's financial condition on Under Armour.

71.     The Q2 2015 10-Q contained signed certifications pursuant to SOX by Defendants Plank (in his capacity as CEO and Chairman of the Board) and Dickerson (in his capacity as CFO and COO) that were substantially similar to those identified above in ¶58.

72.     On October 22, 2015, the Individual Defendants caused the Company to file a current report on Form 8-K with the SEC, attaching as an exhibit a press release that was issued that same day (the "October 22, 2015 Press Release") announcing Under Armour's financial and operating results for the third quarter of 2015 ("Q3 2015").  The October 22, 2015 Press Release

reported that the Company's net revenues increased by 28% (compared with the same period in the prior year) to $1.2 billion, and raised the Company's 2015 net revenue outlook to $3.91 billion, from its prior outlook of $3.84 billion, representing growth of 27% from 2014.   The October 22, 2015 Press Release also raised the Company's 2015 operating income outlook to $408 million, compared to its prior outlook of a range of $405 million to $408 million.  Also in the October 22, 2015 Press Release, Plank made the following statements:

> *Our scoreboard in the third quarter not only marked our 22nd straight quarter of at least 20% net revenue growth, but also our first $1 billion quarter*.  Our ongoing success in 2015 has been driven by innovative, head-to-toe product, combined with game-changing performances by our athletes.
>
> *We are experiencing powerful brand momentum in 2015 and we continue to invest to capitalize on our success in the near-term while establishing the foundation for sustainable growth in the future.  We are confident that the building blocks to reach our Investor Day target of $7.5 billion in net revenues by 2018 are firmly in place.*  As we think bigger about the opportunity of our brand, an ongoing focus on investing in key areas like footwear, international, Connected Fitness and manufacturing capability will position us for the *long runway of growth beyond just the next three years*.  Still, with all the success we have seen to date, we firmly believe that we are just getting started.

Yet again, however, the Individual Defendants caused the October 22, 2015 Press Release to misleadingly omit and/or disregard the then-known and foreseeable effects of Sports Authority's financial condition on Under Armour.

73.     On November 4, 2015, the Individual Defendants caused Under Armour to file its quarterly report on Form 10-Q with the SEC (the "Q3 2015 10-Q"), therein reiterating the Company's financial and operating results for Q3 2015, as previously discussed in the October 22, 2015 Press Release.  However, the Q3 2015 10-Q also misleadingly omitted and/or disregarded the then-known and foreseeable effects of Sports Authority's financial condition on Under Armour.

- 28 -

74.     The Q3 2015 10-Q contained signed certifications pursuant to SOX by Defendants Plank (in his capacity as CEO and Chairman of the Board) and Dickerson (in his capacity as CFO and COO) that were substantially similar to those identified above in ¶58.

75.     On January 28, 2016, the Individual Defendants caused the Company to file a current report on Form 8-K with the SEC, attaching as an exhibit a press release that was issued that same day (the "January 28, 2016 Press Release"), therein announcing Under Armour's financial and operating results for the fourth quarter of 2015 ("Q4 2015") and fiscal year 2015 ("FY 2015").  The January 28, 2016 Press Release reported that the Company's net revenues increased by 31% in Q4 2015 (compared with the same period in the prior year) to $1.17 billion, and net revenues for FY 2015 increased 28% to $3.96 billion, compared with $3.08 billion in 2014. The January 28, 2016 Press Release also updated the Company's 2016 net revenue outlook to $4.95 billion, representing growth of 25% from 2015, and the 2016 operating income outlook to $503 million, representing growth of 23% from 2015.  Also in the January 28, 2016 Press Release, Plank made the following statements:

> *Our core business remains incredibly strong and our 31% net revenue growth in the fourth quarter is clear evidence of the continued expansion in the breadth and depth of our Brand.*  We delivered our 25th consecutive quarter of more than 20% net revenues growth in our largest product category of apparel. Moreover, we continued to diversify our product offering and geographic reach, driving significant market share gains in key strategic areas like basketball footwear, while better meeting the needs of the global athlete with investments in our global Brand House stores and e-commerce sites helping drive 70% growth in international. *With our continued investments across people, systems, and digital, we are confident in our ability to build upon this tremendous momentum, reinforcing our belief that we are just getting started in becoming the next great global brand.*

> \*      \*      \*

> *The Under Armour brand has built tremendous equity over the past 20 years and our financial results are a reflection of that strength.*  Quarter after quarter, year after year, we continue to post meaningful growth across our core businesses with significant opportunity to grow as we diversify both our product portfolio and our geographic reach.  From shirts and shoes to your connected life, *Under Armour*

*will continue to be a leader in innovation to make all athletes better and redefine expectations for what a sports brand should be.*

However, the Individual Defendants again caused the January 26, 2016 Press Release to misleadingly omit and/or disregard the then-known and foreseeable effects of Sports Authority's financial condition on Under Armour.

76.    On February 22, 2016, the Individual Defendants caused the Company to file its annual report on Form 10-K with the SEC (the "2015 10-K"), therein reiterating Under Armour's financial and operating results for Q4 2015 and FY 2015, as previously discussed in the January 28, 2016 Press Release.  Notably, in the 2015 10-K, the Individual Defendants *finally* caused the Company to acknowledge Sports Authority's unstable financial condition.  However, the Individual Defendants nevertheless continued to downplay any potential impact of Sports Authority's financial condition on Under Armour's growth or revenues, stating in relevant part:

*Allowance for Doubtful Accounts*

We make ongoing estimates relating to the collectability of accounts receivable and maintain an allowance for estimated losses resulting from the inability of our customers to make required payments.  In determining the amount of the reserve, we consider historical levels of credit losses and significant economic developments within the retail environment that could impact the ability of our customers to pay outstanding balances and make judgments about the creditworthiness of significant customers based on ongoing credit evaluations. Because we cannot predict future changes in the financial stability of our customers, actual future losses from uncollectible accounts may differ from estimates.  If the financial condition of customers were to deteriorate, resulting in their inability to make payments, a larger reserve might be required.  In the event we determine a smaller or larger reserve is appropriate, we would record a benefit or charge to selling, general and administrative expense in the period in which such a determination was made.  As of December 31, 2015 and 2014, the allowance for doubtful accounts was $5.9 million and $3.7 million, respectively.

***Subsequent to December 31, 2015, we became aware of the deteriorating financial condition of one of our wholesale customers, The Sports Authority.*** Our recorded reserve as of year-end materially reflects our best estimate, based on currently available information, of the ultimate recoverability of amounts due from this customer at December 31, 2015.  As of December 31, 2015, the amount of this receivable totaled $32.5 million.  ***However, we do not currently believe that the***

> ***exposure to our receivables as of December 31, 2015 is materially impacted by the developments related to The Sports Authority.*** If the financial condition of this customer continues to deteriorate, this could result in us recording additional reserves against our receivables balance. See "Risk Factors - If the financial condition of our customers declines, our financial condition and results of operations could be adversely impacted."

77.     The 2015 10-K was signed by Defendants Plank, Molloy, Bodenheimer, Coltharp, Katz, Krongard, Olson, and Sanders, and contained signed certifications pursuant to SOX by Defendants Plank (in his capacity as CEO and Chairman of the Board) and Molloy (in his capacity as CFO) that were substantially similar to those identified above in ¶65.

78.     On March 2, 2016, Sports Authority filed for Chapter 11 bankruptcy protection and announced that it would be closing approximately 140 stores, representing roughly 30% of its total retail locations.  The bankruptcy filing also revealed that Sports Authority had debts of more than $1.1 billion, and that Under Armour was the eighth highest unsecured creditor, with a claim of ***$23,168,557 in trade debt against Sports Authority***.

79.     In response to Sports Authority's bankruptcy filing, on March 4, 2016, the Individual Defendants caused the Company to file a current report on Form 8-K with the SEC, attaching as an exhibit a press release that was issued that same day (the "March 4, 2016 Press Release"), therein announcing that Under Armour was "reiterating its previously issued outlook for 2016 following the recent announcement by The Sports Authority of its commencement of a pre-arranged Chapter 11 bankruptcy restructuring."  The March 4, 2016 Press Release further downplayed the news of Sports Authority's bankruptcy filing, and reassured investors as to the purported fact it would not impact—much less significantly so—Under Armour's business prospects, as follows:

> Based on current visibility, the Company continues to expect 2016 net revenues of approximately $4.95 billion, representing growth of 25% over 2015, and 2016 operating income of approximately $503 million, representing growth of 23% over

2015, in line with the financial targets outlined in the Company's recent earnings release issued on January 28, 2016.

The Sports Authority is a longstanding customer of the Company, and the Company intends to support them as they proceed through their restructuring. ***The Company plans to offset the impact of the bankruptcy on the Company's full year 2016 results through continued sales to The Sports Authority and sales through other channels and customers.  In addition, although the Company does not currently believe that the exposure to its receivables from The Sports Authority is materially impacted by these developments, the Company will continue to monitor the proceedings and its related impact during the first quarter of 2016.***

80.     On April 21, 2016, the Individual Defendants caused the Company to file a current report on Form 8-K with the SEC, attaching as an exhibit a press release that was issued that same day (the "April 21, 2016 Press Release"), therein announcing Under Armour's financial and operating results for the first quarter of 2016 ("Q1 2016").  The April 21, 2016 Press Release reported that the Company's net revenues increased by 30% (compared with the same period in the prior year) to $1.05 billion, and raised the Company's 2016 net revenue outlook to $5.0 billion, representing growth of 26% over 2015.  The April 21, 2016 Press Release also updated the Company's 2016 operating income outlook to a range of $503 million to $507 million.  Also in the April 21, 2016 Press Release, Plank made the following statements:

For the past 24 consecutive quarters or six years, we have driven net revenue growth above 20% and we are incredibly proud of our start to 2016 with first quarter net revenue growth of 30%.  The strong results posted this quarter truly demonstrate the balanced growth of our brand across product categories, channels and geographies.  It also showcases our heightened focus on providing better service across our distribution channels, ensuring that our consumer consistently finds the newest, most premium product from us wherever they shop.

\*       \*       \*

This year marks our 20th year in business, which is a great milestone for our company. ***Our robust growth this quarter demonstrates the power of our brand with growth coming from every part of our business.  Our ability to adapt in a rapidly changing environment has been a critical part of our success and fuels our inspiration to create game-changing products that solve problems and enrich consumers' lives.  With this unrelenting consumer focus and ongoing investment, we are setting the foundation for our growth story over the next 20 years.***

81.     On April 29, 2016, the Individual Defendants caused Under Armour to file its quarterly report on Form 10-Q with the SEC (the "Q1 2016 10-Q"), therein reiterating the Company's financial and operating results for Q1 2016, as previously discussed in the April 21, 2016 Press Release.   However, the Q1 2016 10-Q misleadingly omitted and/or disregarded any mention of Sports Authority's financial condition, and its foreseeable effects on Under Armour.

82.     The Q1 2016 10-Q contained signed certifications pursuant to SOX by Defendants Plank (in his capacity as CEO and Chairman of the Board) and Molloy (in his capacity as CFO) that were substantially similar to those identified above in ¶58.

83.     Then, on April 26, 2016, Sports Authority's counsel notified the bankruptcy court that it would pursue a sale of assets, with an auction scheduled for May 16, 2016.

84.     On May 31, 2016, the Individual Defendants caused Under Armour to file a current report on Form 8-K with the SEC, attaching as an exhibit a press release—titled "Under Armour Updates 2016 Outlook"—that was issued that same day (the "May 31, 2016 Press Release"), lowering the Company's FY 2016 financial guidance, after the Individual Defendants had provided strong reassurances as to the Company's financial health and raised FY 2016 financial guidance just a month earlier.   The Company's updated projection included: (a) FY 2016 net revenues of approximately $4.925 billion (down from the previously projected $5.0 billion); and (b) FY 2016 operating income in a range of $440 million to $445 million (down from the previously projected $503 million to $507 million).   The May 31, 2016 Press Release also announced an impairment charge of $23 million and FY 2016 revenues of $43 million from Sports Authority (instead of the originally planned $163 million), "given the recent decision of the bankruptcy court to approve the

- 33 -

liquidation of The Sport Authority's business rather than a restructuring or sale of the ongoing business."

85.     As a result of this announcement, the Company's Class A Common Stock fell from $37.73 at the close of trading on May 31, 2016 to $36.25 at the close of trading on June 1, 2016, representing a decline of 3.92% ($1.48 per share), on unusually high trading volume of over 19 million shares.  Similarly, the Company's Class C Common Stock fell 3.57% ($1.25 per share) on this news, dropping from a close of $34.97 per share on May 31, 2016 to a close of $33.72 per share on June 1, 2016, on unusually high trading volume of over 3 million shares.

86.     In response to this news, analysts issued reports downgrading Under Armour's stock and commenting on the disconcerting update related to Sport's Authority's bankruptcy.  For example, on May 31, 2016, Credit Suisse issued a report skeptical of Under Armour's prior guidance stating, "[i]t looks like this optimism was somewhat misplaced as the liquidation of The Sports Authority leaves a $120M revenue gap relative to prior expectations," and lowering its price target from $38 to $35.  Also on May 31, 2016, Susquehanna Financial Group, LLP issued a report lowering its price target for Under Armour and expressing "surprise[] [at] the magnitude of the announcement (operating income lowered by ~12%) just a month after 1Q results where guidance was raised despite pressure at [Sports Authority] (announced liquidation a week after UA reported)."  Again on May 31, 2016, Piper Jaffray issued a report lowering its estimates and decreasing its price target for Under Armour from $43 to $35, citing the Company's $23 million impairment charge in Q2 2016 and operating profit forecast of $17 to $19 million, in sharp contrast to the prior forecast of $40 to $42 million.  Then on June 1, 2016, Wells Fargo issued a report lowering its estimates and decreasing its valuation range for Under Armour from $38-$42 to $34-$38.

87.     The stock declines on June 1, 2016 would have been larger had the Individual Defendants revealed the full truth to investors regarding the Company's financial problems related to Sports Authority's financial difficulties and instability, and ultimately its bankruptcy and liquidation.  However, Defendant Plank continued to mislead the market in the May 31, 2016 Press Release, stating that "our brand's momentum is stronger than ever as we continue to see growth and increased demand across all categories and geographies."

### 2. The Materially False and Misleading Statements During Under Armour's 2015 Investor Day

88.     On September 16, 2015 (the start of the Class Period identified in the Securities Complaint), the Individual Defendants caused the Company to hold its 2015 Investor Day (the "2015 Investor Day").  During the 2015 Investor Day, several members of Under Armour's senior management, including Defendants Plank and Dickerson, gave presentations on behalf of the Company.

89.     Throughout the 2015 Investor Day, Plank, Dickerson, and other senior executives repeatedly emphasized the Company's continuing growth and demand.  Plank specifically assured investors that "[t]he demand for our brand has never been stronger," and told investors that the Company's growth streak would continue:

> We've enjoyed 21 consecutive quarters of 20-plus% revenue growth, more than five years of 20-plus% revenue growth quarter in a quarter out, delivering and finding a way and doing it not because we are pushing or pressing, because it's the demand and the app from our consumer.  We are one of only two companies in the S&P 500 that can make that claim, and we are very proud of that and what that means.  And frankly, we have no expectation of that stopping anytime soon.

90.     Also during the 2015 Investor Day, Dickerson added that "[a]pparel, our largest category, continues to grow over 20% approaching a $5 billion business, doubling the size of the business since 2014."  With respect to women's products, Kelly Cortina, Under Armour's Vice President of the Women's Division, proclaimed "[d]emand for our product is growing."

91.     Another Company representative, Susie McCabe, Under Armour's Senior Vice President of Global Retail, made clear that despite its ultra-aggressive growth targets, Under Armour would be "protect[ing] the brand" through controlled use of off-price distribution and "not chas[ing] easy profits."

92.     In line with these comments, the Individual Defendants aggressively projected that these trends would continue.  In their opening remarks, Plank and Dickerson announced bold projections of $7.5 billion in revenue in 2018, and $800 million in operating income by 2018.  These figures represented dramatic increases over the Company's expected performance in 2015 ($3.84 billion in revenue and $405 to $408 million in operating income).

93.     In addition, Plank, Dickerson, and other senior executives made the following projections of continued revenue growth of greater than 20%, accelerated apparel growth, and a doubling of the North American business by 2018:

[Plank:] We have no expectation of [revenue growth greater than 20%] stopping anytime soon.

                    *        *        *

[Stafford:] We see our businesses in . . . apparel . . . set to accelerate, not just grow, but accelerate growth, over the course of the next three years.  With apparel approaching $5 billion . . . there is significant runway . . . .

                    *        *        *

[Matt Mirchin, President, North America:] We will more than double our [North American] business by 2018 -- from 2014 through 2018 at a 21% CAGR.  Our biggest business is going to more than double through 2014 through 2018.  Let me take a step back, let me slowdown and repeat that.  Our biggest business will more than double from 2014 to 2018.

                    *        *        *

[Dickerson:] Within North America, as Matt [Mirchin] stated before we continue to expect a 20% plus CAGR and more than double our revenue from just under $2.8 billion in 2014 to almost $6 million in 2018.

- 36 -

94.     Separately, Dickerson stated that margins would be constrained by the Company's growing international and footwear businesses.  Notably, however, Dickerson did not disclose that the Company's apparel business—its largest and most important business—was also compressing margins as a result of the discounting, promotions, and lower ASPs the Company was implementing in an attempt to compensate for reduced customer demand for its apparel products.

95.     Regarding inventory, Dickerson misleadingly stated that planned initiatives (rather than slowing apparel sales) would cause elevated inventory growth rates through 2015 and 2016 for the purpose of "flow[ing] product earlier" and "delivering our products to our consumers more timely, specifically on key seasonal floor set dates."

96.     Not surprisingly, analysts reacted positively to the statements made during the 2015 Investor Day.  For example, in a report dated September 16, 2015, Sterne Agee CRT maintained its "Buy" rating on Under Armour's stock and stated that "UA continues to be our #1 pick for long-term growth investors."  And on September 16, 2015, KeyBanc Capital Markets issued a report stating, "UA has one of the strongest growth profiles in our coverage, tactical execution continues to improve and investments should continue to support >20% top-line growth over the next few years. We think UA's impressive growth demonstrates the power of strong brands."

### 3.     The Materially False and Misleading Statements Made in Reporting Under Armour's Third Quarter 2015 Financial Results

97.     Discussing the Company's Q3 2015 financial results in the October 22, 2015 Press Release that the Individual Defendants caused Under Armour to file, Plank boasted: "Our scoreboard in [Q3 2015] not only marked our 22nd straight quarter of at least 20% net revenue growth, but also our first $1 billion quarter."

98.     Also on October 22, 2015, the Individual Defendants caused Under Armour to hold a conference call with investors and analysts to discuss the Company's Q3 2015 financial results

(the "Q3 2015 Call"), during which Defendants Plank and Dickerson participated on behalf of the Company.  During the Q3 2015 Call, Dickerson admitted that margins had contracted, and a similar decline was expected in Q4 2015.  However, Dickerson misleadingly blamed such contraction on relatively benign factors, including the strength of the U.S. dollar, exchange rates, and the emerging footwear business (which carried lower margins), rather than declining sales of apparel, which led to lower ASPs, discounting, promotions, and reduced gross margins.

99.    Dickerson was asked for additional details on the Company's margin contraction during the question-and-answer session of the Q3 2015 Call with analysts, and made clear that margins in the apparel business were not to blame, and were actually ***improving***:

> [Omar Saad, Evercore ISI:] [O]ne follow-up on the gross margin comments, Brad. I understand the headwinds, the FX, the mix shift, et cetera.  But you mentioned product margin as one of the benefits to the gross margin line, thinking 80 or 90 bps, something like that.  Can you be a little bit more specific and expand upon what you mean by product margin driving one of the takes against the puts?

> [Dickerson:] That's really probably more on our core apparel business.  ***Overall, our core product margins, whether it be through pricing and/or costing, just in general across the globe, North American, international, most of our core apparel product margins are improving.***  That's helping offset some of the other pressures we talked about.

> [Saad:] Is that more generating scale in the business on the cost side?  Are you taking price strategically, or is it mixed to more premium products?  Maybe just expand a little bit more?

> [Dickerson:] Yes, it's a little bit across the board. . . .  But, again, ***you would expect from a perspective of improving product margins that our apparel business would be the place we see the most of that; because it's obviously our longer business and existing business, so that's where we're seeing it right now.***

100.   The Individual Defendants also continued their aggressive projections in the October 22, 2015 Press Release and during the Q3 2015 Call, raising the Company's FY 2015 outlook for net revenues (27% growth, to approximately $3.91 billion) and operating income (15% growth, to approximately $408 million).  Dickerson also provided a preliminary outlook for

2016 with respect to net revenue growth (approximately 25%) and operating income growth (approximately 23%), in line with the Company's bold projections at the 2015 Investor Day. Additionally, Plank reiterated, "[w]e are confident that the building blocks to reach our Investor Day target of $7.5 billion in net revenues by 2018 are firmly in place."

101.    Separately, Dickerson admitted that the Company anticipated elevated inventory over the next few quarters, but ***did not*** attribute this to the Company's slowing apparel sales. Instead, Dickerson blamed this on a strategic plan to flow product to customers in a timelier manner, and stated that inventory "should start to normalize a little bit as we work through 2016 . . . .  So, as you start working through Q1 and Q2 of 2016, you should start to normalize that and get back more in line with revenue growth."

102.    Once again, analysts reacted positively to Defendants' statements regarding Under Armour's strong Q3 2015 financial results made in the October 22, 2015 Press Release and during the Q3 2015 Call.  For example, in a report dated October 22, 2015, Oppenheimer commented that sales growth "outpaced expectations" and Oppenheimer "look[ed] favorably" upon the results. Also on October 22, 2015, SunTrust maintained its "Buy" rating on Under Armour's stock, and commented that the Company showed "[s]trength across categories" and its guidance should prove "conservative."  And on October 23, 2015, Telsey Advisory Group issued a report maintaining its "Outperform" rating on Under Armour's stock and stated that the results "marked another solid beat and raise quarter" for Under Armour.

103.    The Individual Defendants then caused Under Armour to file the Q3 2015 10-Q on November 4, 2015, therein reiterating the Company's financial and operating results for Q3 2015, as previously discussed in the October 22, 2015 Press Release and the Q3 2015 Call.  Additionally, the Q3 2015 10-Q stated, "[w]e believe that our growth in net revenues has been driven by a

growing interest in performance products and the strength of the Under Armour brand in the marketplace."

104.    As described above in ¶74, the Q3 2015 10-Q contained signed certifications pursuant to SOX by Defendants Plank (in his capacity as CEO and Chairman of the Board) and Molloy (in his capacity as CFO) that were substantially similar to those identified above in ¶58.

### 4.    The Materially False and Misleading Statements Made When Investors Began to Learn the Truth Through Partial Disclosures

105.    The Individual Defendants could only conceal the truth for so long as the Company's apparel sales problems worsened, which increasingly slowed the Company's revenue and operating income growth and compressed the Company's margins.  The Company's problems were ultimately revealed in a series of partial disclosures causing a series of sharp declines in Under Armour's stock price.  The declines would have been swifter and steeper, but the Individual Defendants downplayed the negative news and continued to mislead the market with misrepresentations and omissions regarding the state of the Company's financial condition.  By continuing to mislead the market in this manner, the Individual Defendants kept the Company's securities prices artificially inflated throughout the Relevant Period.

106.    On January 10, 2016, Morgan Stanley issued a report (the "Morgan Stanley Report") downgrading the Company, reducing its sales and earnings per share ("EPS") growth forecasts for the Company, and significantly reducing its price target for the Company's stock from $103 to $62 per share.  Citing retail data, the report explained that Under Armour's North American apparel business was slowing, leading to market share and average sales price declines, stating as follows:

> Data indicates near-term earnings uncertainty is more than just weather: Recent SportScan data shows [Under Armour] is losing market share for the first time in 3 years in apparel and, more surprisingly, ASPs are falling at an accelerating pace. Both trends are more pronounced in women's apparel, despite major marketing

investment in this division last year.  Though warm weather surely explains some of this, we think [Under Armour] may be reaching maturity in US apparel faster than previously thought.  Though we remain constructive on [Under Armour]'s int'l opportunity, we don't think the shares are priced for a US slowdown.

107.    According to the Morgan Stanley Report, these declines had been occurring ***since at least spring of 2015*** (*i.e.*, prior to the start of the Relevant Period):

Overall, [Under Armour] sales growth [in apparel] has decelerated on both a one- and two-year basis since spring 2015 and recently, the data suggests [Under Armour] is losing apparel market share [].  Plus, ASP growth has been steadily decelerating, from positive low-single-digits gains in 2014 to negative low-single-digit growth this year. This compares unfavorably to the industry and Nike, which have both experienced steadily increasing ASPs [].

108.    In particular, the Morgan Stanley Report concluded that the Company's sales of women's apparel were in sharp decline: "Lately the overall trend of slowing sales growth, falling ASPs, and market share losses cited above have been more pronounced in women's apparel. Women's apparel sales growth has lagged men's by roughly 500 bps YTD with slightly higher ASP declines.  Plus, [Under Armour] has lost only a small amount of share in men's, but share loss in women's has been larger and happening for 5 months, while Nike continues to take share []."  This was "concerning because Under Armour invested nearly $15M in a major marketing campaign in 2014 targeted toward women. . . .  To continue its growth story, [Under Armour] must excel in women's apparel."

109.    The Morgan Stanley Report also raised concerns about Under Armour's potential distribution deal with Kohl's, a mid-tier department store that ran frequent promotions: "Entering Kohl's would seem like Under Armour is risking some of its brand equity to find growth . . . [and] would imply there may not be as much growth in these other channels as previously thought."

110.    Moreover, the Morgan Stanley Report noted that, in addition to the apparel problems, "[Under Armour] running footwear prices are down 20% since January 2013, while the industry's are down just 4%. . . . [Under Armour] has always competed on brand image and

innovation, rarely on price.  This change in trend is a major concern because this positioning threatens to erode [Under Armour]'s premium brand image and ultimately its long-term growth potential."  The Morgan Stanley Report also noted that, with respect to the Company's Curry Two basketball shoes, Under Armour appeared to be "trad[ing] price for volume growth," which "risks damaging the premium image that is the source of the long-term growth potential."

111.    ***The day after*** publication of the Morgan Stanley Report, the Company's Class A Common Stock price fell $2.52 per share (or approximately 6.72%) from a closing price at $37.50 per share on Friday, January 8, 2016, to close at $34.98 on January 11, 2016, on unusually high trading volume of 14.5 million shares.

112.    In the wake of the Morgan Stanley Report, a number of analysts followed suit by releasing negative commentary on the Company.  For example, on January 21, 2016, BB&T Capital Markets maintained its "Hold" rating on Under Armour, stating that "[g]iven the current retail environment and warmer than normal temperatures across the US during Q4, we believe there is risk inventory growth could be even higher level than originally planned, which adds to our concerns for more conservative H1'16 EPS."  Then, on January 25, 2016, Cowen and Company issued a report lowering its estimates and reducing its price target on Under Armour to $95 from $110.  And on January 26, 2016, Deutsche Bank issued a report lowering its price target and commenting that Under Armour's product discounting was "likely worse than expected."

113.    A week after the Morgan Stanley Report caused the aforementioned sharp decline in the Company's stock price, the Individual Defendants caused Under Armour to file the January 28, 2016 Press Release.  In announcing, among other things, the Company's financial results for Q4 2015 and FY 2015, the January 28, 2016 Press Release included the following statement by Defendant Plank: "Our core business remains incredibly strong and our 31% net revenue growth

in the fourth quarter is clear evidence of the continued expansion in the breadth and depth of our Brand.  We delivered our 25th consecutive quarter of more than 20% net revenues growth in our largest product category of apparel."

114.    Also on January 28, 2016, the Individual Defendants caused Under Armour to hold a conference call with investors and analysts to discuss the Company's Q4 2015 and FY 2015 financial results (the "Q4/FY 2015 Call"), during which Defendants Plank, Dickerson, and Molloy participated on behalf of the Company.  In his opening remarks during the Q4/FY 2015 call, Plank continued to boast of the Company's explosive growth, particularly with respect to the apparel business, as follows: "In the fourth quarter, Apparel growth at 22% showcases that our brand has products for all seasons and temperatures . . . ."

115.    Plank also discussed declining margins and increasing inventory, but pinned the blame once again on relatively benign and short-term factors (*i.e.*, faster growing but lower margin footwear and international business, the strength of the U.S. dollar, and higher freight expenses), rather than declines in the Company's apparel business.

116.    Similarly, Dickerson tied excess inventory and liquidations to a designed strategy to deliver products to customers earlier, as well as recent weather trends, rather than any sales problems caused by the declining apparel business, as follows:

> This growth is largely a result of our strategy to focus on delivering our products to our consumers in a more timely manner and thus drive higher fill rates. . . .  In addition, ***the recent weather trends have led to some excess inventory creation***, which we will continue to work through across our normal liquidation channels during the first half of 2016.

117.    Following Dickerson's opening remarks, an analyst questioned the Individual Defendants about the Morgan Stanley Report showing the Company's slower growth, loss of market share, and ASP reductions.  Dickerson downplayed the point-of-sale retail data cited in the report (*i.e.*, SportScan data), claiming the data was too focused on the Company's large accounts like

Dick's and Foot Locker.  In response to the same question, Dickerson and Plank also reassured

investors that, notwithstanding such data, apparel growth was robust, and the Company was still

on track to meet the Individual Defendants' ultra-aggressive growth projections:

> [Matthew J. McClintock, Barclays:] My question is, Kevin, there seems to be a lot
> of debate in the marketplace on several of your strategies.  You kind of hit upon
> some of this in your prepared remarks but, in particular, the competitive positioning
> of both your footwear and your women's business and then also the potential
> maturity of the domestic business.  I was wondering if you can give us your updated
> thoughts on those topics?  Have there been any strategic changes that we should be
> thinking about?  Thanks.
>
> [Dickerson:] . . . .  So utilizing that [SportScan] data as a proxy for our success
> especially in the fourth quarter, it can be a little bit challenged.  As we've seen
> obviously because we posted another strong quarter, our Apparel growing over
> 20%.  So I just wanted to start that answer with, just let's be careful on some of
> what those data sets set there and understand how they relate to our business in
> particular.
>
> [Plank:] . . . .  In the fourth quarter with 31% growth and frankly, marking our 23rd
> consecutive quarter of 20% plus top-line revenue growth.  Our growth story is
> strong.  We remain a growth company and none of that is wavered.
>
> *  *  *
>
> Our brand, our presence, our ability to drive ASPs have never been stronger in
> North America.
>
> *  *  *
>
> In the third quarter in North America, we grew 25%.  In the fourth quarter in North
> America, we grew 26%.  I don't know if I'd call that accelerating, but I would
> certainly call it strong.
>
> *  *  *
>
> So to be clear about North America, we still see abundant opportunities across the
> continent.  As we said at our Investor Day in September, we believe that we will
> double this business by 2018.

118.    The Individual Defendants were asked specifically about ASPs of apparel and gross

margins, to which Plank and Dickerson responded as follows:

> [Omar Saad, Evercore ISI:] You kept mentioning premiumization, I think
> specifically to the footwear.  Can you just dig a little bit deeper there and then talk

about, does this translate over to Apparel at some point and we start to see ASPs going up there?

Brad, maybe you could comment on premiumization, maybe how it might flow through gross margin over time, especially if you look at gross margin excluding the mix shift drag and the FX drag?  What are the really underlying gross margins going to do over time? Thanks.

[Plank:] . . . .  So, first of all, on the Apparel side is that, again, a majority of our business 70% plus of our business is still in Apparel.  So it is our focus.  It's our largest team here.  Frankly, it is where we have built our brand as innovators.

*       *       *

As we look forward into 2017, we really see the ability to drive efficiency, of really looking at pricing, of really looking at the ability for us to maximize and optimize things like margin . . . .  We continue to drive and demonstrate that premium position in the marketplace.

[Dickerson:] . . . .  We were able to offset a lot of that [gross margin increase] just through our general increase and improvement in product margins, specifically on the Apparel side.

So as you look forward in 2016 and beyond, you should see continued improvement in places . . . like our Apparel product margins . . . .

So, I think in all aspects of our business, you will see that improve over time. . . .  Our ability to improve margins in Apparel is not only possible but it is happening right now as we speak.

119.    Plank later added that "we do see the ability to continue to drive ASPs and improve margin by a true premium product is the way that we will build it out."

120.    The Company's earnings release on January 28, 2016 also claimed that the Company's fiscal year 2016 ("FY 2016") financial targets continued to be in line with the aggressive financial targets Defendants provided at the Company's 2015 Investor Day: net revenues of approximately $4.95 billion (25% growth over FY 2015) and operating income of approximately $503 million (23% growth over FY 2015).

121.    During the subsequent conference call, Plank projected that "we continue to expect inventory growth rates to be slightly elevated above the revenue growth rate in the front half

of 2016, with growth rates expected to level off and be in line with revenue growth in the back half of 2016," which was misleadingly blamed on a strategy to focus on delivering products to customers in a more timely manner, rather than apparel sales declines.

122.    Analysts reacted positively to the Individual Defendants' statements on January 28, 2016 regarding Under Armour's strong Q4 2015 and FY 2015 financial results.  For example, in a report dated January 28, 2016, SunTrust reiterated its "Buy" rating and described Under Armour's "growth engines" as "firing on all cylinders."   Also on January 28, 2016, KeyBanc Capital Markets issued a report praising Under Armour's "impressive" revenue growth and predicting "+25% top-line growth over the next few years," citing "ongoing investments in innovation, as well as new categories and markets," including investments in Connected Fitness. Again on January 28, 2016, Susquehanna Financial Group, LLP issued a report describing the results as providing a "sigh of relief" and "tackl[ing] investor concerns," and increased its price target to $87 from $73.

123.    The 2015 10-K, which the Individual Defendants caused Under Armour to file on February 22, 2016—and which were signed and certified by the Individual Defendants pursuant to SOX, as described above in ¶¶65 and 77—reiterated the Company's financial and operating results for Q4 2015 and FY 2015, and stated further as follows: "We believe that our growth in net revenues has been driven by a growing interest in performance products and the strength of the Under Armour brand in the marketplace."

124.    Additionally, as previously described, the March 4, 2016 Press Release, which the Individual Defendants caused Under Armour to file, confirmed the Company's previously released net revenue and operating income projections for 2016—notwithstanding the bankruptcy of Sports Authority, one of Under Armour's largest retail customers—and stated further that the Company

planned to offset the impact of the bankruptcy on the Company's FY 2016 results "through continued sales to The Sports Authority and sales through other channels and customers."

125.     Additionally, in announcing the Company's financial results for Q1 2016, among other things, in the April 21, 2016 Press Release that the Individual Defendants caused Under Armour to file, Plank continued his exceedingly positive messaging, stating as follows: "For the past 24 consecutive quarters or six years, we have driven net revenue growth above 20% and we are incredibly proud of our start to 2016 with first quarter net revenue growth of 30%.  The strong results posted this quarter truly demonstrate the balanced growth of our brand across product categories, channels and geographies."

126.     Plank was similarly optimistic as to Under Armour's future growth.  Despite the recent bankruptcy of Sports Authority on March 2, 2016, the Company raised its outlook for FY 2016 net revenues and operating income to approximately $5.0 billion (26% growth) and a range of $503 to $507 million (23-24% growth), respectively.

127.     Also on April 21, 2016, the Individual Defendants caused Under Armour to hold a conference call with investors and analysts to discuss the Company's Q1 2016 financial results (the "Q1 2016 Call"), during which Defendants Plank and Molloy participated on behalf of the Company.  During the question-and-answer session of the Q1 2016 Call, Plank was asked about the health of the Company's North American wholesale channel.  He acknowledged it was "obviously a tough quarter for some of our partners in sporting goods," but reassured analysts of the Company's continued brand strength and wholesale demand, as follows:

> [Camilo Lyon, Canaccord Genuity:] Kevin, I wanted to get your thoughts on just the health of the North America wholesale channel.  There's a lot of moving parts, and some of your bigger customers have been shutting doors, some of the tertiary players are going away.  Can you talk about the health of that channel and what that could lead to from a channel expansion opportunity, and how do you think about segmentation within that strategy?

[Plank:] . . . .   I mean, posting 30% growth in a quarter where two -- one of our largest customers, one of our top two or three customers a few years ago filed for bankruptcy.  I think putting that kind of number up is something that just continues to demonstrate the strength of the brand and how strong our portfolio ultimately is.

\*          \*          \*

We do believe that there is still an underlying very strong wholesale market out there.  And we expect to continue to be iconic, to be a destination.

\*          \*          \*

So . . . our growth is effectively coming from everywhere. And North America is something that we feel incredibly strong about.

128.    In response to a separate question, Plank emphasized that "[a]nd again we are, to be clear, driving massive growth.  We are taking share."  Later in the call, Plank projected that "[t]his year we expect every quarter to top $1 billion in revenues, based on our updated outlook of $5 billion, an important milestone for our brand."

129.    During his opening remarks, Molloy discussed rising inventory and declining gross margins.  As to inventory, Molloy blamed "strategic initiatives we embarked upon early last year to improve service levels for our wholesale customers," rather than rising levels caused by declining apparel sales.  As to gross margins, Molloy blamed "higher liquidations to clear through excess inventory and foreign currency exchange rates," but stated that product margins were favorable (offsetting the overall gross margin declines), rather than disclosing that apparel product margins were declining as a result of reduced customer demand, prompting lower sales prices, discounting, and promotions.  Molloy also projected flat gross margins for FY 2016.

130.    In response to an analyst question later in the call, Molloy stated that the majority of inventory increases were planned and expected to "creep away" during 2016, as follows:

[Camilo Lyon, Canaccord Genuity:] If you could just disaggregate the composition of inventory between planned inventory increases and any sort of excesses that you have, given the liquidations that you had during the quarter.  And coupled with the expectations for flat gross margin in Q2.  If you could just help us understand.  It

seems like we're shifting more towards that planned increase, if I'm reading that correctly.  But just any detail there would be great.

[Molloy:] . . . .  The majority of the growth is planned.  But we did have slightly excess . . . .  But, we are working through that. . . .  It'll start to creep away as we go through the year.  So we are working through it.  But the majority of it is planned.

131.    Analysts reacted positively to the Individual Defendants' statements made during the Q1 2016 Call regarding Under Armour's strong Q1 2016 financial results and bright outlook for the remainder of 2016.  For example, in a report dated April 21, 2016, Deutsche Bank Market Research raised its price target to $53 from $47.50 and stated that "not only did [revenues] surpass expectations, but so did gross & operating margins and EPS" and also noted that the Company's management "reiterated that inventories would normalize in 2Q."  On April 22, 2016, Canaccord Genuity maintained its "BUY" rating, stating that the Company's "stellar Q1 is evidence of the broad-based momentum the brand is experiencing across categories, channels, and geographies, and moreover should allay concerns around its growth outlook and opportunities."  Also on April 22, 2016, Telsey Advisory Group issued a report stating that it continued "to view Under Armour as one of the most compelling growth stories in the space," maintaining its "Outperform" rating, raising its 2016 and 2017 EPS estimates, and increasing its price target to $53.

132.    Meanwhile, while the Company's securities were artificially inflated as a result of the Individual Defendants' wrongful conduct, several of the Individual Defendants misappropriated their insider knowledge to sell personally-held Under Armour securities for massive gains.  Plank personally cashed in on such artificial inflation by unloading *over 4.7 million shares* of his Company stock for total proceeds of *over $328.5 million* during the Relevant Period.  Plank's sales were suspiciously timed, with a large portion of these sales—900,000 shares sold (*i.e.*, 18.9% of total shares Plank sold during the Relevant Period) for total proceeds of approximately $38.3 million (*i.e.*, 11.7% of total proceeds from shares Plank sold during the

Relevant Period)—occurring ***within just eight days*** after the Company raised guidance on April 21, 2016.

133.    The Q1 2016 10-Q, which the Individual Defendants caused Under Armour to file on April 29, 2016, reiterated the Company's financial and operating results for Q1 2016, as previously discussed in the April 21, 2016 Press Release and the Q1 2016 Call, and stated, *inter alia*, the following: "[w]e believe that the growth in our business has been driven by a growing interest in performance products and the strength of the Under Armour brand in the marketplace"; "[t]he increase in net sales was driven primarily by: Apparel unit sales growth and new offerings in multiple lines led by training and golf"; and "[t]he decrease in gross margin percentage was primarily driven by the following: approximate 100 basis point decrease driven by increased liquidation as a result of our changing inventory management strategy, which we expect to continue during the first half of 2016 on a more limited basis."

134.    As described above in ¶82, the Q1 2016 10-Q contained signed certifications pursuant to SOX by Defendants Plank (in his capacity as CEO and Chairman of the Board) and Molloy (in his capacity as CFO) that were substantially similar to those identified above in ¶58.

> ### 5.    *The Materially False and Misleading Statements Regarding the Departures of The Company's Chief Merchandising Officer and Chief Digital Officer*

135.    After the market closed on May 3, 2016, the Individual Defendants caused the Company to surprise investors by filing a Form 8-K with the SEC announcing the departures of two key executives, Chief Merchandising Officer ("CMO") Stafford and Chief Digital Officer ("CDO") Thurston, both of whom spoke glowingly about the Company's financial results and outlook at the 2015 Investor Day.  No reason was provided for the departures.  The market viewed the departures as a signal of potential trouble at Under Armour, particularly coming on the heels of former CFO and COO Dickerson's departure, and Morgan Stanley's downgrade and exposure

of problems affecting the Company's revenue and operating income growth, gross margins, and market share, as well as the bankruptcies of three major retail customers of the Company (Sports Authority, Vestis Retail Group/Sports Chalet, and City Sports).

136.   As a result of this news, the price of Under Armour's Class A Common Stock dropped significantly.  After closing at $42.73 per share on May 3, 2016, the Class A Common Stock price dropped 7.54% ($3.22 per share) to close at $39.51 per share on May 4, 2016, on unusually high trading volume of almost 19 million shares.

137.   The Company's Class C Common Stock, which was issued to Class A Common Stock holders on a one-for-one basis after the market closed on April 7, 2016, also dropped on the news of the departures.  The Class C Common Stock price closed at $40.12 per share on May 3, 2016, and fell to $37.39 per share at the close of trading on May 4, 2016, a drop of 6.80% ($2.73 per share), on unusually high trading volume of over 4.5 million shares.

138.   The stock declines would have been greater had Defendants revealed the internal troubles at the Company that precipitated the departures, including the apparel merchandising issues discussed above contributing to Stafford's departure.  Instead, they were completely silent as to any reasons for the departures.  In reality, the departures were influenced or precipitated by the Company's myriad problems including the declining apparel sales growth, loss of market share, increased discounting, and elevated inventory levels.

139.   Despite Defendants' efforts to downplay the news, Under Armour's announcement that Stafford and Thurston were both resigning from the Company was met with skepticism from certain analysts.  For example, in a report dated May 4, 2016, Piper Jaffray reiterated its "Neutral" rating and cautioned that "these frequent departures leave us concerned on the company's ability to attract and retain top talent."  Also on May 4, 2016, Brean Capital, LLC lowered its rating to

"Hold" and explained its "more cautious stance" was due, in part, to the heighted executional risks associated with the resignations.  Again on May 4, 2016, BB&T Capital Markets issued a report describing the resignations as "the latest in significant turnover in [the Company's] C-suite and other Brand/Segment Presidents over the past several years."

> **6.      The Materially False and Misleading Statements Regarding the Bond Offering Materials**

140.    On June 6, 2016, the Individual Defendants caused Under Armour to file the Registration Statement with the SEC in connection with the Bond Offering.  Additional Offering Materials were filed by the Company on June 8, 2016 and June 9, 2016.

141.    The Offering Materials incorporated by reference the Company's 2015 10-K (signed and certified by the Individual Defendants pursuant to SOX, as described above in ¶¶65 and 77) and Q1 2016 10-Q (certified pursuant to SOX by Defendants Plank and Molloy, as described above in ¶82), which contained the false and misleading statements and omissions of material fact detailed above in ¶¶76 and 123, and below in ¶207.

> **7.      The Materially False and Misleading Statements Regarding the Company's Financial Results for the Second Quarter of 2016 Following Partial Revelation of a Growth Slowdown**

142.    On July 26, 2016, just three months after raising guidance, the Individual Defendants caused Under Armour to file a current report on Form 8-K with the SEC, attaching as an exhibit a press release that was issued that same day (the "July 26, 2016 Press Release"), announcing disappointing financial results for Q2 2016.  The July 26, 2016 Press Release reported that operating income and net income decreased 29% (to $19 million) and 58% (to $6 million) from the prior year period, respectively, in connection with the $23 million impairment related to the liquidation of Sports Authority.  Moreover, apparel sales rose only 18.9% over the prior year period, the first time apparel sales growth had dropped below 20% in nearly seven years.

143.     The July 26, 2016 Press Release also reported a gross margin of 47.7% in Q2 2016, compared with 48.4% in the prior year's period, "primarily reflecting negative impacts of approximately 130 basis points from sales mix driven by strong growth in footwear and international, partially offset by approximately 50 basis points from improved product cost margins." Earnings were only $0.01 per share, $0.03 lower than the prior year's period.

144.     Also on July 26, 2016, the Individual Defendants caused Under Armour to hold a conference call with investors and analysts to discuss the Company's Q2 2016 financial results (the "Q2 2016 Call").  In his opening remarks, Molloy added that the Company expected its gross margin percentage to decline slightly for both Q3 2016 and FY 2016.

145.     During the question-and-answer session that followed, Molloy was asked how the Sports Authority dynamic would affect sales for the remainder of FY 2016.  Molloy stated that "we did ship product in the first quarter and second quarter to [Sports Authority]. . . .  It is about 300 to 400 basis points of our growth in the back half of the year without shipping to [Sports Authority].  We have made up some of that, but not all of it."

146.     Separately, the Company forecasted Q3 2016 sales growth of about 20%, its slowest growth in over six years, citing the Sports Authority bankruptcy.

147.     On this news, the Company's Class A Common Stock fell from a close of $43.59 per share on July 25, 2016 to a close of $41.36 per share the following day, July 26, 2016, a decline of 5.12% ($2.23 per share), on unusually heavy trading volume of nearly 18 million shares.  The stock dropped an additional 3.97% ($1.64 per share) the next trading day, closing at $39.72 per share on July 27, 2016, on unusually high trading volume averaging over 9 million shares, as the market continued to digest the news.  The total stock price decline over this two-day period was 8.88% ($3.87 per share).

148.   The Company's Class C Common Stock also fell on this news, dropping from $38.78 per share at the close of trading on July 25, 2016 to $37.50 per share at the close of trading on July 26, 2016, a decline of 3.33% ($1.28 per share), on usually high trading volume of over 3.6 million shares.  The stock continued to fall an additional 4.19% ($1.57 per share) the following day to close at $35.93 per share on July 27, 2016, on higher-than-average volume of over 1.1 million shares, representing a total decline of 7.35% ($2.85 per share) over the two-day period.

149.   The stock declines would have been larger had the Individual Defendants caused the Company to reveal the full truth to investors.  However, the Individual Defendants continued to mislead investors and downplayed the negative news.  The Company reported revenue growth of 28% (its 25th consecutive quarter of 20%+ net revenue growth).  Plank stated in his opening remarks on the Q2 2016 Call that "[o]ur second-quarter results are strong evidence that demand for Under Armour has never been higher."

150.   Echoing this message, in his opening earnings call comments, Molloy emphasized "the consistent growth across our diverse product lines and channels [that] delivered another quarter of strong results," including growth in apparel revenues.

151.   During the question-and-answer session that followed, an analyst inquired about "athletic inventory in the channel today" and whether Plank was comfortable with the promotional backdrop.   Plank admitted to a high level of promotion as well as a shifting retail environment, but misleadingly stated that the level of promotion was the same as in prior years, and that the Company's core base of apparel would continue to grow, notwithstanding shifting fashion trends such as athletic leisure:

> [Matthew Robert Boss, JPMorgan:] Kevin, can you talk about athletic inventory in the channel today?  It sounds like inventory for you guys will be in line with sales by the end of this quarter.  Nike expects to be clean by August.  Are you comfortable

with the promotional backdrop you see out there today?  Larger picture, what would you say to those calling for a top in the athletics cycle out there?

[Plank:] Yes, I'm not going to say I'm comfortable with the promotion out there in the market today; but I don't know if it's that's different than what we've seen over the last several years, either.

*     *     *

I think there's a shift happening.  I think the way people are dressing is changing, and it's altering.  I don't know if it'll be as extreme as just women's buying black tights, and whether people can make a career out of that.  Obviously there have been a lot of people jumping in the boat on women's, specifically in the athleisure trend.  But the good news is that we're not grounded in trend, we're grounded in sport.  That will keep us here and the trends will come and go; but we're also watching our core base continue to grow for us, as well.

152.    The Individual Defendants also reiterated the Company's FY 2016 net revenue outlook of $4.925 billion (24% growth) and operating income outlook of $440 to $445 million (8-9% growth).  Molloy stated that "[b]ased on our current visibility, we continue to expect 2016 net revenues of approximately $4.925 billion, representing growth of 24% . . . . [F]or the third quarter, we expect revenues to grow approximately 20%, as we begin to lap our strategies to better service our customers, and as we navigate through the impact of the Sports Authority liquidation."

153.    Later in the call, Plank was asked about how the slowdown in growth would impact projections going forward.  Plank reassured analysts that the brand remained strong and explosive revenue growth would continue: "[W]e're 25 quarters north of 20% in a row, over six years of doing that, we see that trend continuing for us, number one.  We do continue to see it to project 25%-plus growth for the full year."

154.    In response to an analyst question, Molloy also indicated that the gross margin inflection was temporary, stating "we will see notable improvements in the actual product margins in Q4," and gave the misleading impression that it was caused by the footwear and international businesses, rather than any margin compression associated with apparel.

155.    Despite the Individual Defendants' continued false and misleading statements, a number of analysts reacted negatively to the Individual Defendants' statements made during the Q2 2016 Call regarding Under Armour's Q2 2016 financial results and declining average sales prices.  For example, on July 26, 2016, Macquarie Research issued a report lowering its estimates and decreasing its price target for Under Armour to $40 from $47.  Then on July 27, 2016, a Morgan Stanley report dug below the surface of Under Armour's announcement, stating, "Sales are growing solidly, but ASPs are fading.  UA competes on brand image and innovation, rarely on price.  This trend change is a concern because it suggests a fundamental shift in the UA story."

156.    On August 3, 2016, the Individual Defendants caused Under Armour to file its quarterly report on Form 10-Q with the SEC (the "Q2 2016 10-Q"), therein reiterating the Company's financial and operating results for Q2 2016, as previously discussed in the July 26, 2016 Press Release and the Q2 2016 Call.  Additionally, the Q2 2016 10-Q stated that "[w]e believe that the growth in our business has been driven by a growing interest in performance products and the strength of the Under Armour brand in the marketplace."

157.    The Q2 2016 10-Q contained signed certifications pursuant to SOX by Defendants Plank (in his capacity as CEO and Chairman of the Board) and Molloy (in his capacity as CFO) that were substantially similar to those identified above in ¶58.

### 8.    The Materially False and Misleading Statements Regarding the Goldman Sachs Global Retail Conference

158.    On September 7, 2016, Molloy represented the Company at the Goldman Sachs Global Retailing Conference.  Molloy assured Goldman Sachs analysts that the Company's inventory positions were strong and the Company's promotions were constrained.  When asked how he would "characterize inventory levels at retail, not just for you guys but sort of across the category right now," Molloy responded that inventory was now "really healthy" and improved,

and that despite excess inventory earlier in the year, the Company had not participated "too much" in promotions:

> For us, we're in a really good position. We feel really healthy and it's our understanding that the marketplace is in a healthy position too. Came out of the winter season, there was a lot of excess inventory. You then combine that with the Sports Authority bankruptcies and some other smaller bankruptcies, it was flush with inventory. It was a promotional environment. We didn't participate, have to participate too much in the promotional environment.
>
> But from what we can understand that as of the end of August that most of the domestic retail partners are in really good inventory positions. We know we are.

159. In response to a separate question later in the call, Molloy stated that "retail is pretty good and inventories are clean."

160. Regarding a question about inventory expectations in the second half of 2016, relative to Q2 2016, Molloy stated that "we feel really good about -- and I think we're – everyone is encouraged that the inventory positions got cleaned up a lot sooner than many expected." Separately, Molloy stated that inventory growth in the second half of 2016 would generally be in line with sales growth.

**9.      The Materially False and Misleading Statements Regarding the Company's Financial Results for Q3 2016 Following Partial Revelation of a Growth Slowdown and Compressed Margins**

161. On October 25, 2016, the Individual Defendants caused Under Armour to file a current report on Form 8-K with the SEC, attaching as an exhibit a press release that was issued that same day (the "October 25, 2016 Press Release"), surprising investors by reporting a gross margin of only 47.5% in Q3 2016, compared with 48.8% in the prior year's period. Also on October 25, 2016, the Individual Defendants caused Under Armour to host a conference call to discuss the Company's Q3 2016 financial results (the "Q3 2016 Call"), during which Plank and Molloy participated on behalf of the Company. In his opening remarks during the Q3 2016 Call, Molloy stated that the Company's margins "declined more than planned" due to factors including

higher discounts, promotions, and liquidations.   Looking forward, Molloy added that "[g]ross margins for the full-year are expected to decline approximately 80 basis points compared to last year, driven by the same factors that we have experienced through the year."

162.   During the conference call, Molloy further revealed that apparel growth would be less than projected at the 2015 Investor Day: "[T]he landscape for our business in our industry continues to evolve. . . .  North America apparel growth is slowing across the industry.  While we expect to continue to significantly outpace the apparel industry, the growth rate going forward will be less than expected from our Investor Day in 2015."

163.   Molloy also signaled that the Company would not be able to meet the 2018 operating income projection of $800 million that was originally provided at the Company's 2015 Investor Day, stating instead that "we expect annual operating income growth in the mid-teens each of the next two years." In the question-and-answer session that followed, Plank provided additional detail on problems that led Defendants to lower operating income guidance, stating that "in North America, it is a place that provided incredible air cover for our brand for a very long time.  And I think, like we are seeing in a lot of places, that is modifying and it's changing. . . . [D]emand for the Under Armour brand . . . certainly hasn't reappeared dollar for dollar in our immediate distribution."

164.   The Company's stock fell sharply as a result of this negative news.   Under Armour's Class A Common Stock dropped from a close of $37.90 per share on October 24, 2016 to a close of $32.89 per share the following day, October 25, 2016, a decline of 13.22% ($5.01 per share), on unusually heavy trading volume of over 58 million shares.   The stock dropped an additional 5.93% ($1.95 per share) over the next three trading days, closing at $30.94 per share on October 28, 2016, on higher-than-average trading volume averaging over 17 million shares per

day, as the market continued to digest the news.  The total stock price decline over this four-day period was 18.36% ($6.96 per share).

165.    The Company's Class C Common Stock also dropped precipitously on this news, from a close of $32.90 per share on October 24, 2016 to a close of $28.37 per share the following day, October 25, 2016, representing a decline of 13.77% ($4.53 per share), on unusually heavy trading volume of over 6.8 million shares.  The stock dropped an additional 8.67% ($2.46 per share) over the next three trading days, closing at $25.91 per share on October 28, 2016, on higher-than-average trading volume averaging over 4 million shares per day, representing a total decline over this four-day period of 21.25% ($6.99 per share).

166.    The stock declines would have been larger had the Individual Defendants caused the Company to reveal the full truth regarding the Company's problems.  Instead, the Individual Defendants continued to mislead investors and downplayed the negative news.  The Company reported net revenue growth of 22% for Q3 2016.  Plank boasted during the Q3 2016 Call that "[w]e are a growth company.  And with our 26th consecutive quarter of 20%-plus revenue growth, we continue to demonstrate our ability to drive a bigger and better company quarter after quarter.  Our financial results are an incredible accomplishment for any brand and something that we believe separates us from others in our business."

167.    Plank also stated during the Q3 2016 Call that the apparel business was "incredibly profitable and still growing, like to the tune of 18% in just the third quarter for us.  So, there's not an end to the North American apparel story.  That continues to march on for us as well.  We just have other opportunities that are outpacing some of that growth."

168.    Also during the Q3 2016 Call, Molloy emphasized the Company's growth, including growth in apparel revenues.  Molloy gave similarly positive guidance with respect to

revenue and operating income growth, expecting "full-year 2016 net revenues of approximately $4.925 billion, representing growth of 24%.  And operating income in the range of approximately $440 million to $445 million, representing growth of 8% to 9%" and fourth quarter revenues expected to "grow approximately 20%."  He also added that "[w]e believe the strength of our brand and increased breadth of head-to-toe product offerings position us for another quarter of strong growth in what has been a challenging North American retail environment."

169.   Molloy also stated during the Q3 2016 Call that "[a]t our 2015 Investor Day, we announced our goals of achieving $7.5 billion of revenues and $800 million of operating income by 2018.  We are on track to achieve our 2018 revenue goal of $7.5 billion and expect to grow full-year revenues consistently in the low 20%s in both 2017 and 2018."

170.   During the Q3 2016 Call, Plank also referenced future pressure on margins and operating income, but blamed it on the fast growing footwear and international businesses becoming greater sources of revenue (affecting the sales "mix") and the need for additional investment "on multiple fronts" to take advantage of growth opportunities (as opposed to the declining apparel business being a source of the margin and operating income issues).  Similarly, Molloy admitted that gross margins would be flat over the next couple of years, but blamed this on a mix shift based on fast growing footwear rather than apparel sales issues.

171.   Molloy also assured investors that "[d]espite liquidations having been a headwind on margin rates for most of this year, we now believe that our inventory position is healthier and liquidation should not have the same negative impact moving forward."  In response to an analyst question later in the call, Molloy falsely stated that the Company was "in really good shape from an inventory perspective" and "growth rates [have] come down.  But the inventory is in great shape."

172.    Notwithstanding Defendants' attempts to put a positive spin on the disappointing Q3 2016 results, analysts reacted negatively to Defendants' statements on October 25, 2016.  For example, on October 25, 2016, Morgan Stanley issued a report calling Under Armour's updated guidance "surprisingly weak."  Also on October 25, 2016, Equity Research issued a report stating the Company's new 2017/2018 outlook was "far worse than expected."    Again on October 25, 2016, William Blair issued a report downgrading Under Armour to "Market Perform" and noting the new earnings growth guidance was "down materially from the company's last analyst day goal."  Then on October 26, 2016, Cowen and Company issued a report lowering its price target to $35 and downgrading its rating for Under Armour to "Market Perform," noting the Company had "substantially reduced its operating income target to ~ $585MM vs. our prior estimate of $760MM."

173.    On November 2, 2016, the Individual Defendants caused Under Armour to file a Form 10-Q with the SEC(the "Q3 2016 10-Q"), therein reiterating the Company's financial and operating results for Q3 2016, as previously discussed in the October 25, 2016 Press Release and the Q3 2016 Call.  Additionally, the Q3 2016 10-Q stated that "[w]e believe that the growth in our business has been driven by a growing interest in performance products and the strength of the Under Armour brand in the marketplace."

174.    The Q3 2016 10-Q contained signed certifications pursuant to SOX by Defendants Plank (in his capacity as CEO and Chairman of the Board) and Molloy (in his capacity as CFO) that were substantially similar to those identified above in ¶58.

> ### 10. *The Materially False and Misleading Statements Regarding the Company's Financial Results for the Fourth Quarter of 2016 and Fiscal Year 2016 Following Revelations of a Severe Growth Slowdown and the Sudden Resignation of CFO Molloy*

175.   The Company finally began to more fully reveal the extent of its problems to investors on January 31, 2017.   On that day, the Individual Defendants caused the Company to file a current report on Form 8-K with the SEC, attaching as an exhibit a press release that was issued that same day (the "January 31, 2017 Press Release"), therein stunning investors by announcing dramatically lower-than-expected growth and other financial problems during the fourth quarter of 2016 ("Q4 2016") and FY 2016.   In the January 31, 2017 Press Release, Plank attributed the declines to "numerous challenges and disruptions in North American retail [that] tempered our fourth quarter results."   Specifically, the Company revealed that:

• Net revenues grew only 12% (to $1.3 billion) in Q4 2016 (the Company's crucial holiday season), breaking a streak of 26 consecutive quarters with greater than 20% revenue growth.   Net revenues in FY 2016 were $4.8 billion, lower than the Company's guidance of $4.925 billion issued just a few months prior, on October 25, 2016.

• Operating income dropped 6% to $167 million in Q4 2016 and increased only 3% to $420 million in FY 2016 (lower than the projected range of $440 to $445 million, an increase of 8-9%, for FY 2016).

• FY 2016 gross margin dropped from 48.1% to 46.5%.

• Q4 2016 EPS were $0.23, lower than analysts' consensus estimate of $0.25.

• FY 2016 inventory increased 17%.

176.   Moreover, the January 31, 2017 Press Release provided a surprisingly negative outlook for 2017.   Net revenues were expected to grow only 11-12%, down sharply from the more than 20% revenue achieved by the Company for 26 consecutive quarters.   In addition, the

Company's gross margin was "expected to be slightly down compared to the prior year," and its operating margin was expected to fall to approximately $320 million.

177.  Coupled with the negative financial results and outlook, the January 31, 2017 Press Release also announced that Defendant Molloy had decided to leave the Company "due to personal reasons."  Molloy's sudden departure was highly suspicious since he was only at Under Armour for 13 months.  In addition, Molloy was the fourth high-level senior executive to depart within that time frame, following Dickerson (who Molloy replaced as CFO), Stafford (CMO), and Thurston (CDO).  Plank was replaced by Dave Bergman ("Bergman"), the Company's SVP of Corporate Finance.

178.  During a conference call with analysts on the same day, January 31, 2017 (the "Q4/FY 2016 Call"), the Individual Defendants elaborated on the news revealed in the Company's earnings release.  Specifically, Plank, Molloy, and Bergman participated in the call on behalf of the Company.  In his opening remarks, Plank provided reasons for the poor results, citing a host of reasons including 2016 bankruptcies, channel dislocation, destocking, slower customer traffic, and poor product assortment, resulting in "significant promotional activities," lower pricing, and a "discounted environment":

> While it's certainly not new news, throughout 2016 bankruptcies, channel dislocation and destocking combined to disrupt the overall North American retail landscape.
>
> *       *       *
>
> So, first, I'd like to explain a few things.  What happened, what we learned and what we're doing about it.  So let's start with what happened.  In the fourth quarter, slower traffic caused significant promotional activities, earlier, deeper and broader than expected.  This commoditized some of our more basic core product that had previously sold through for us in years past.
>
> This, in addition to higher demand for more lifestyle silhouettes caused us to be out of balance with our assortment.  So we lost top line volume as we worked to adapt for our mix and pricing.  Now, to be fair, we did comp positively in the quarter in

both our own retail stores and our e-commerce channel, but ultimately the result was below our original plan.

There was also lower channel recapture of bankruptcy volume that we'd expected, as pricing came down in the points of distribution that we serve.  Finally, we say out of balance with our cold weather product assortment that was on the floor, which in years past have been able to absorb through full-price sales.

179.    While Plank couched these issues as having emerged in Q4 2016, in reality, this was a continuation of problems known, or recklessly disregarded, by the Individual Defendants throughout the Relevant Period.  Plank added that, going forward, the Company would attempt to address these issues by evolving "to better align with what consumers want, with what consumers need" and, in particular, "accelerating our lifestyle product offering to capture broader demand."

180.    In his opening remarks, Molloy added that "for reasons Kevin [Plank] detailed, apparel revenue came in lighter than we had originally anticipated" and that sales to wholesale customers were "moderated by the challenges in our North American business that we have spoken to today." He emphasized that "North American apparel is still our largest and most profitable business by far. Accordingly, less-than-expected growth in this area disproportionately pressures our overall growth rate."

181.    Molloy also stated that "[f]ourth-quarter gross margin decreased 320 basis points to 44.8%, compared to 48% in the prior-year's period.  The decrease includes a negative impact of approximately 230 basis points driven by higher discounts and promotions," as well as lower margins resulting from footwear and international sales.  As to full-year gross margins, Molloy cited a decline of "160 basis points to 46.5% . . . primarily due to actions to better manage our inventory, including discounting, especially in the back half of the year."

182.    Discussing the updated outlook for 2017, Bergman stated that "based on the macro factors we've discussed on today's call and proactive actions to manage inventory levels down in

the marketplace, we expect full-year revenues to be up approximately 11% to 12% to nearly $5.4 billion in 2017."  Regarding the first quarter of 2017 ("Q1 2017"), Bergman stated:

> We anticipate the first quarter to grow at a mid single-digit rate as fourth-quarter conditions in North America carry over and we will have not yet lapped some of the significant bankruptcies we saw in 2016.  We're expecting first-quarter gross margin to be down almost 100 basis points year over year, as many of the same factors from the fourth quarter pressure our margins, including foreign currency impacts and higher promotions and discounts.

183.   Bergman also signaled that inventory levels would continue to rise for most of 2017: "In our efforts to manage the brand appropriately for the marketplace, we are planning for inventory growth to be higher than revenue growth for the first three quarters of 2017 and coming more in line with revenue growth during the fourth quarter."

184.   During a question-and-answer session with analysts, Plank confirmed the shift in consumer preference towards more fashion-oriented athletic apparel and referenced increased competition and heavy discounting in Under Armour's "core basic" performance-oriented athletic apparel:

> [Omar Saad, Evercore ISI:] [M]aybe if you could expand on a comment you made in the prepared remarks around some trends going on in the apparel business, maybe moving away from performance more to fashion or lifestyle.  I know the UA Sportswear line is still nascent.  But maybe elaborate on what you are seeing from that standpoint.
>
> Is there something pretty deep going on at the consumer level?  A shift towards more fashion oriented athletic apparel versus performance oriented.  Obviously, Under Armour is known for its technical performance.  If this is the case, how do you evolve the brand a little bit to be really relevant on both sides of that fence?
>
> Plank:  Yes. . . .
>
> We need to become more fashionable with the products that we have out there.  One of the things we've found is that some of the core basics were some of the challenges that we saw, is that we were counting on core basics as we have in years past to do more work for us, but the consumer today frankly has more options.
>
> Frankly, most of those options are from good brands that we compete with that are heavily discounting as well.  So what you'll see is that I don't think it's one shift of

abandoning one for the other.  Obviously with things like the investment we're making in [Under Armour Sportswear] and sport lifestyle in general, but we need to become more fashion.  The consumer wants it all.

185.    Plank responded to a separate question by stating that the retail market for apparel was being "disrupted" and that "promotions and the consumer environment, all those things are very, very real, but we could have done a better job with our merchandising mix to be more proactive and more thoughtful about where they were going."

186.    Separately, an analyst from UBS inquired about 2017 gross margins as to the North American market: "I would have thought that would largely be down next year due to more markdowns.  Then your guidance and inventory seems to sound like it will be improving through the year relative to the rate of revenue growth.  What do you think is the realistic near-term recapture rate for the gross margin after 2017 after some inventory clearing?" Bergman confirmed that "[w]e should see a little bit less pressure from the promotional environment, especially in the back half of the year, but we'll still see a lot of pressure from that in the front half of the year."

187.    On this news, the price of Under Armour stock plummeted.  After closing at $28.94 per share on January 30, 2017, shares of Class A Common Stock dropped 25.74% ($7.45 per share) in a single trading day, closing at $21.49 per share on January 31, 2017, on unusually high trading volume of approximately 54 million shares.  This represented the largest single-day stock price decline in the Company's history.  The stock continued to drop an additional 3.91% ($0.84 per share) over the next two trading days, closing at $20.65 per share on February 2, 2017, on unusually high trading volume averaging over 16 million shares per day, as the market continued to digest the news.  The total stock price decline over this three-day period was 28.65% ($8.29 per share).

188.    Shares of Under Armour's Class C Common Stock also fell sharply as a result of this news. After closing at $25.09 per share on January 30, 2017, shares of Class C Common Stock

dropped 23.40% ($5.87 per share) in a single trading day, closing at $19.22 per share on January 31, 2017, on unusually high trading volume of approximately 57 million shares.  The stock dropped an additional 5.72% ($1.10 per share) over the next two trading days, closing at $18.12 per share on February 2, 2017, on unusually high trading volume averaging nearly 14 million shares per day, representing a total decline of 27.78% ($6.97 per share) over this three-day period.

189.    Under Armour's Bond prices also declined in response to this news, as well as Bond downgrades resulting from this news that were issued by S&P (from investment grade (BB+) to junk status (BBB-)) and Moody's (from stable to negative outlook) on February 1, 2017.  The Bonds closed at $94.08 on January 30, 2017 and dropped 1.68% ($1.58) in a single trading day, closing at $92.50 on January 31, 2017.  The Bonds continued to fall an additional 3.24% ($3.00) the following trading day, closing at $89.50 on February 1, 2017 (the day of the downgrades), representing a total decline of 4.87% ($4.58) over this two-day period.

190.    In wake of this news, several analysts and media issued negative reports on the Company, citing its disappointing financial results and decreased guidance, and the unexpected departure of Molloy.  For example, on January 31, 2017, Barclays issued a report dramatically lowering its price target from $50 to $20 and stating, "[w]e were wrong and missed the severity of this downside scenario."  Likewise on January 31, 2017, Deutsche Bank Markets Research issued a report reducing its estimates and lowering its price target 40.6% from $32 to $19, noting that Under Armour's wholesale growth slowed to 5%, apparel growth slowed to 7%, and Molloy's departure "after just one year, add[ed] greater uncertainty to the story."  Also on January 31, 2017, a CNN Money article reported that, in addition to missing sales and earnings forecasts and providing lower-than-expected 2017 guidance, "[Under Armour] said its chief financial officer was stepping down for 'personal reasons.'  Wall Street often assumes that an executive leaving for

'personal reasons' is a sign that a company is in trouble and that someone needs to take the fall. Under Armour (UAA) tanked on this trifecta of bad news.  Shares plunged nearly 25% in early trading Tuesday.  That put the stock on track for its worst one-day drop ever."  Again on January 31, 2017, the New York Times released an article titled, "Making Under Armour Simple Takes Its Toll."  The article observed that the Company "reported its slowest top-line growth in eight years and signaled more challenges ahead. Its chief financial officer is also bailing.  The news wiped a quarter off the company's market value.  And the chief executive's strategy of maintaining power [by controlling the Company's voting stock] is underperforming badly. . . . [R]evenue growth slowed drastically to 12 percent because of deep discounting caused by slower foot traffic."  Then on February 1, 2017, Telsey Advisory Group issued a report stating that "the magnitude of the miss on sales and gross margin in 4Q16, coupled with the magnitude of the guide-down for 2017 came as a pretty big shock" and "we believe there are certainly reasons to revisit the investment thesis as estimates and multiples are revised downwards."  Also on February 1, 2017, Oppenheimer issued a report calling Under Armour's announcement an "unprecedented 4Q16 miss" and observing "11 downgrades on the Street thus far."  And on February 3, 2017, Sporting Goods Monitor issued a report expressing its disappointment with Under Armour's announcement, stating that "2017 guidance sees revenue growth at half of the rate we, and Wall Street, expected" and Under Armour's management "severely over-promised at the [C]ompany's 2015 Investor Day and again in more recent earnings calls."

### D.   **Subsequent Developments and Revelations**

191.   Since the time of the foregoing allegations, the financial downturn of Under Armour continued, and additional revelations came out regarding the nature and severity of the problems caused by the Individual Defendants throughout the Relevant Period.

192.    For example, on February 9, 2017, The Motley Fool published an article titled,

"5 Signs Under Armour Inc. Needs New Management," which stated the following:

> Under Armour needs a leader who makes realistic promises.  At the end of fiscal
> 2015, [Under Armour] estimated that its annual revenue would rise 25% to $4.95
> billion in 2016.  However, its 2016 revenue actually rose just 22% to $4.8 billion,
> and [Under Armour] now expects sales to rise just 11-12% in 2017.
>
> That slowdown casts doubts on Plank's claim that Under Armour can generate $7.5
> billion in annual revenues in fiscal 2018. Plank insists that the company is still on
> track to hit that target, but that would require its top line growth to accelerate to
> over 40% in 2018 -- which hardly seems realistic.

193.    On April 3, 2017, FBR Capital Markets ("FBR") downgraded Under Armour's

rating to underperform and slashed the Company's Class A Common Stock price target from $20

to $14 based on "recent checks, proprietary surveys, unfavorable trends, and our apparel/footwear

analysis pointing to continued sales/margin pressure."  FBR observed an "intensifying" price war

with Nike, which, "coupled with the [North American] athletic apparel inventory glut, could cause

UA apparel growth/margins to be worse than expected."

194.    On April 27, 2017, the Individual Defendants caused Under Armour to file a current

report on Form 8-K with the SEC, attaching as an exhibit a press release that was issued that same

day (the "April 27, 2017 Press Release"), announcing, among other things, the Company's

financial results for Q1 2017.  The April 27, 2017 Press Release revealed total net revenue growth

of only 7%—drastically lower than the consistent 20% growth the Individual Defendants reported

and projected throughout the Relevant Period.   Additionally, net revenue growth from the

Company's apparel business also grew only 7%, the North American business was down 1%, gross

margin was down 70 basis points (to 45.2%) purportedly "due to continued inventory management

efforts," and inventory increased 8%.

195.    Also on April 27, 2017, the Individual Defendants caused Under Armour to hold a

conference call with investors and analysts to discuss the Company's Q1 2017 financial results

(the "Q1 2017 Call"), during which Defendant Plank and the Company's new CFO, Dave Bergman, participated on behalf of the Company, and discussed the Company's struggles.  Much of the Q1 2017 Call focused on the Company's sales declines, heavy promotional environment, and need to evolve the Company's apparel fashion.  Plank stated that the Company was "reinventing" its "core basics," including the introduction of new offerings to address consumer demand for lifestyle products.  Plank also admitted that the Company "knew" of the "pervasive" promotional environment in North America and "could have done a better job" in the "back half of 2016."

196.    On June 20, 2017, David Butler published an article on SeekingAlpha.com titled, "Underperforming Under Armour."  Butler stated that "[e]verything really peaked in 2014 when UA was bringing in 32% revenue growth, 32% growth in gross income, and 28% growth in net income.  Ever since, things have been slowing. It's not a trendy shift either.  We've seen almost two and half years of decreasing business growth.  The company isn't maneuvering to maintain margins in spite of the slowdown either."

197.    On June 26, 2017, Kenra Investors published an article on SeekingAlpha.com titled, "Under Armour: Negative Signals Still Abound."  The article discussed continual declines in the Company's brand power and customer interest dating back to 2015, stating, "There are several datasets that show ongoing weakness for Under Armour. . . .  Google Trends is a good benchmark to track a brand's popularity and also a decent one to have an idea of how digital sales are evolving. . . .  [T]here is a strong downtrend [that] started in mid-2015, and search interest [in Under Armour] actually became negative since a few months ago." The article concluded that the Company's "[b]rick and mortar sales are declining, the sentiment towards the brand is not positive,

and search interest is in a sharp downtrend. . . . So many negative signs make me think the company could soon see sales growth in negative territory, fueling the downtrend that started in 2015."

198.    Another June 26, 2017 article titled, "Under Armour Continues to Lose Popularity," by L&F Capital Management (published on SeekingAlpha.com), discussed Under Armour's declining brand strength as reflected in a recent earnings call by Finish Line, one of Under Armour's main sporting goods retail customers.  The author's takeaway was that "Nike (NKE) and Adidas (OTCQX:ADDYY) continue to dominate the athletic retail scene, while Under Armour's (UAA) popularity continues to fade."  The article continued:

> It almost goes without saying that the Under Armour brand isn't what it was just two years ago, but the damage may be much worse than what investors think. In comparing this [Finish Line] earnings call to previous calls, we observed a dramatic shift in [Finish Line] management's sentiment on the Under Armour brand. For example, on the Q1 call just two years ago, Under Armour was mentioned 9 times. On Friday morning's call, Under Armour was mentioned just once . . . and it was a part of a broader discussion regarding multiple brands.

199.    On July 21, 2017, The Motley Fool published an article titled, "Why Under Armour Inc. Stock Is down 30% This Year."  The article observed that "Shares of Under Armour (NYSE:UA) (NYSE:UAA) have been falling behind this year, with the sportswear stock down 30% . . . .  The stock collapsed following an ugly fourth-quarter earnings report at the beginning of the year [on January 31, 2017] and it's been unable to recover since, trading sideways."  Specifically, the article noted that wholesale revenue was up just 5% in Q4 2016 and that "[g]ross margin fell 320 basis points in the [fourth] quarter to 44.8%, a sign the company was forced to discount products as it misread demand."  The article concluded that "Under Armour's slowing growth is a sign that the company needs to change if it wants to one day reach the size of rivals Nike and Adidas . . . .  The company needs to establish itself as a fashion brand as well as a performance one."

200.   News from the Company worsened on August 1, 2017, when the Individual Defendants caused Under Armour to file a current report on Form 8-K with the SEC, attaching as an exhibit a press release that was issued that same day (the "August 1, 2017 Press Release"), announcing, among other things, the Company's financial results for the second quarter of 2017 ("Q2 2017").  The August 1, 2017 Press Release reported total net revenue growth and apparel net revenue growth of 9% and 11%, respectively—once again, well below the quarterly growth beyond 20% reported and projected by the Individual Defendants throughout the Relevant Period. Footwear also performed surprisingly poorly, with net revenue declining 2%.  The Company blamed the revenue declines on a "dynamic and promotional retail environment in North America [that] continued to temper results."  The Company also reported an operating loss of $5 million, a net loss of $12.3 million, and $0.03 decline in diluted EPS.  Gross margin declined 190 basis points (to 45.8%) based in part on "inventory management initiatives" with inventory again increasing 8%.

201.   In conjunction with this negative news, the Individual Defendants caused the Company to announce on August 1, 2017 that it was implementing a massive restructuring plan "to more closely align its financial resources to support the [C]ompany's efforts to better serve the evolving needs of the changing consumer and customer landscape."  As a result, the Company announced expected "restructuring and related charges" of $110 to $130 million in 2017, including "approximately $20 million of inventory related charges and approximately $40 million of intangibles and other asset related impairments."  The restructuring will involve a reduction of 2% of the Company's global workforce (about 280 jobs), roughly half coming from the Company's headquarters in Baltimore.

202.    Also on August 1, 2017, the Individual Defendants caused Under Armour to hold a conference call with investors and analysts to discuss the restructuring and the Company's Q2 2017 financial results (the "Q2 2017 Call").   Participating on behalf of the Company, Defendant Plank discussed the restructuring in more depth, stating that "[t]he landscape is evolving quickly, therefore we too must evolve quickly.   This evolution requires a pivot, and we're doing just that."  He later explained that "we are clearly operating in a different environment, particularly in our largest market, North America.   With our largest growth drivers including international, footwear and DTC continuing to scale, but still not yet large enough to offset the magnitude of North America on our overall business, the terrain has changed and so must we."

203.    Later in the call, Plank was asked by an analyst "what's happening with the business and some of the trends, especially the top line, can you just give us something where you think the brand health is and the vision for the business today?"  He acknowledged that "we're not pleased with where we're positioned right now" and explained that the Company was trying to evolve from performance-oriented products to "style, innovation, lifestyle, things that look like people want to wear."   To that end, he later added that "we've adjusted the balance of product that we've had, which has decreased many of the core and key items that we've had.   We used to have – we're very much a key item focus, a big logo hoodie and things in store.   And now we've had a lot of balance of that around versatility, layering, newness. . . .  We will be telling our story in the back half of this year and you'll see increased brand heat coming from us, frankly, spending against that."

204.    The Company's negative news on August 1, 2017 also involved a reduction in guidance for fiscal year 2017.  Total net revenue was expected to grow only 9-11% (compared to previous guidance of 11-12%), "reflecting moderation in the [C]ompany's North American

business," while adjusted diluted EPS was projected to be in the range of $0.37-$0.40 (lower than analysts' expectation of $0.42).

205.    As a result of this news, the Company's securities price fell precipitously.  After closing at $20.02 per share on July 31, 2017, the Company's Class A Common Stock price dropped 8.59% ($1.72 per share) to close at $18.30 per share on August 1, 2017, on unusually high trading volume of over 22 million shares.  The Company's Class C Common Stock price also dropped on the news, closing at $18.11 per share on July 31, 2017, and falling to $16.23 per share at the close of trading on August 1, 2017, a drop of 10.38% ($1.88 per share) on unusually high trading volume of over 23 million shares.  The Bonds also declined, falling from a close of $93.24 on July 31, 2017 to a close of $92.00 on August 1, 2017 ($1.24 per Note), a decline of 1.33%.

206.    Following the Company's revelations on August 1, 2017, Business Insider published an article on the same day observing that "Under Armour is losing ground with US customers. . . .  [I]ts North American sales increased a meager 0.3% in the most recent quarter – a far cry from its long history of double-digit revenue growth.  The company is now cutting its full-year sales forecast because of weak demand in North America."  Regarding the reasons for this decline, the article observed that "[t]he company has been facing fierce competition from Nike and Adidas in the US. . . . [and] US customers are abandoning the brand because it lacks a clear identity." The article further noted that "Plank has previously acknowledged [on January 31, 2017] that [he] misread the trend of athleisure, instead relying on logos and basic styles of sportswear."

**E.**    **The Reasons the Relevant Period Statements Issued By the Individual Defendants Were False and Misleading**

207.    The true facts, which were known or recklessly disregarded by the Individual Defendants, but were concealed from the investing public, were as follows:

(a)     Under Armour's apparel products, which accounted for most of the Company's sales, suffered from reduced customer appeal and demand, which led to a host of financial problems experienced by the Company, including declining revenue and operating income growth, reduced market share, excess inventory, lower ASPs, increased discounting and promotions, and compressed margins, instead giving investors the misleadingly positive perception that the Company's growth, including apparel growth, remained strong and consistent with historical trends, and that demand for the Company's products "has never been stronger";

(b)     The Company was not "protect[ing] the band" through controlled use of off-price distribution and refraining from "chas[ing] easy profits," but rather was slashing sales prices and running discounts and promotions in an attempt to maintain aggressive growth projections and combat the core apparel declines, which compressed margins;

(c)     The Company's apparel and North American margins were not "improving" or "offset[ing]" other sources of margin decline, but rather were deteriorating due to increasing Company discounts and promotions, and falling ASPs of the Company's products, as the Individual Defendants scrambled to maintain lofty growth projections in the face of declines in the Company's apparel business;

(d)     The Company's inventory increases were not primarily due to the purported justifications offered by the Individual Defendants—*i.e.*, earlier purchases to better service consumer demand during peak season, a strategy to focus on delivering products to consumers in a more timely manner and thus drive higher fill rates, strategic initiatives to improve service levels for wholesale customers, or recent weather trends—but rather were due to declining sales of the Company's apparel;

(e)     The Company's inventory levels were not "healthier," in "great shape," or "cleaned up a lot sooner than many expected," but rather were inflated, continued to grow, and a major problem causing a high level of inventory that the Company was forced to liquidate at discounted prices, as customer demand for the Company's apparel products persistently suffered;

(f)     The Company was not experiencing net revenue growth driven by "a growing interest in performance products and the strength of the Under Armour brand in the marketplace," but rather demand was shifting away from performance products offered by the Company to more fashion-oriented products offered by the Company's competitors, and the Company's brand strength was diminishing;

(g)     The Company was not "watching [its] core base continue to grow" despite changing fashion trends, but rather the Company's failure to capitalize on changing fashion trends (*i.e.*, the athletic leisure trend), was reducing demand for the Company's products and thus reducing the Company's core base;

(h)     Contrary to Plank's assurance that the Company's ability "to drive ASPs ha[s] never been stronger in North America," the Company's ASPs were falling sharply in North America as the Individual Defendants attempted to compensate for the reduced demand and slowing sales of the Company's apparel products, requiring the Company to lower prices;

(i)     Contrary to the Individual Defendants' attempts to downplay the Morgan Stanley Report, the Company was experiencing lower apparel sales growth, increasing ASPs, and a loss of market share;

(j)      The Company was not "driving massive growth, and . . . taking share," but rather growth and market share were falling as a result of the Company's apparel sales declines;

(k)      The Company's gross margin declines were not primarily driven or caused by "changing inventory management strategy" or strategically planned inventory increases, and were not offset by "favorable product margins," but rather product margins were a primary driver of gross margin declines, resulting from falling ASPs, excess inventory, increased discounting and promotions, lower sales prices, and liquidations due to lower consumer demand for the Company's apparel;

(l)      Declines in the Company's gross margins and operating income were not temporary or driven solely by the Company's footwear and international businesses becoming greater sources of revenue or need for additional investment to take advantage of growth opportunities, but rather such declines were also a function of the Company's declining apparel business, which reduced sales and ASPs, while increasing promotions, discounts, inventory, and liquidations;

(m)      Declines in the Company's apparel business, resulting from lower customer demand, contributed to the surprising departures of the Company's CMO (Stafford) and CDO (Thurston) on May 3, 2016;

(n)      Contrary to Plank's statement that the "brand's momentum is stronger than ever as [the Company] continue[s] to see growth and increased demand across all categories and geographies," growth in and demand for the Company's apparel business were in decline—*not* increasing;

(o)      The Company was not experiencing consistent growth across all product lines and channels, but rather growth was slowing due to the Company's declining apparel business;

(p)     The Company's promotions were growing and were not the same as "the last several years," but rather they were much higher, as the Company ran an increasing number of promotions of apparel products throughout the Relevant Period;

(q)     The Individual Defendants' projections for continued growth in revenue and operating income in FY 2016 had no reasonable basis because the Individual Defendants omitted known, or recklessly disregarded, material facts regarding the Company's declining apparel sales, which showed that such projections could not be achieved;

(r)     The financial difficulties and instability faced by, and ultimately the bankruptcy and liquidation of, Sports Authority—one of the critical wholesale retailers and distributors of Under Armour products—had impacted, was impacting, and would continue to impact Under Armour's financials and business prospects;

(s)     The Company's Q2 2014 10-Q, Q3 2014 10-Q, 2014 10-K, Q1 2015 10-Q, Q2 2015 10-Q, Q3 2015 10-Q, 2015 10-K, Q1 2016 10-Q, Q2 2016 10-Q, and Q3 2016 10-Q failed to disclose to the market the materially adverse conditions described in this paragraph, in violation of Item 303 of Regulation S-K, 17 C.F.R. §229.303 ("Item 303");

(t)     Under Armour had inadequate corporate accounting and corporate financial-reporting resources;

(u)     Under Armour inadequately assessed the risks associated with the Company's financial reporting;

(v)     Under Armour failed to maintain and/or lacked effective internal controls over financial reporting; and

(w)     as a result of the foregoing, the Company's touted business model, future business

and financial prospects, business practices, compliance policies, and internal controls were

materially false and misleading at all relevant times.

208.    As a result of the false and misleading statements and omissions, made or caused

to be made by the Individual Defendants, Under Armour shares traded at artificially inflated prices

during the Relevant Period.  Once the true facts regarding the Company's financial prospects and

future business prospects began to emerge, investors sold Under Armour stock in droves, causing

the Company's stock prices continued decline, with the price of its Class A Common Stock closing

at only $11.61 on November 3, 2017, and its Class C Common Stock closing at just $10.59 on

November 3, 2017, resulting in a total loss of a staggering ***$16.8 billion*** in market capitalization

(*i.e.*, investors' funds), as compared to the Relevant Period high for the Company's Class A and

Class C stock of $52.05 on September 17, 2015.

**F.      While the Individual Defendants Artificially Inflated the Company's Stock Price, the Insider Selling Defendants Capitalized on Material, Non-Public Information**

209.    While the Company's shares were trading at artificially-inflated prices due to the

Individual Defendants' aforementioned false and misleading statements and/or omissions, the

Insider Selling Defendants capitalized on this material, non-public information to sell massive

quantities of personally-held Under Armour stock during the Relevant Period.

210.    In fact, while the Company's securities were artificially inflated as a result of the

Individual Defendants' wrongful conduct, several of the Individual Defendants misappropriated

their insider knowledge to sell personally-held Under Armour securities for massive gains.  Plank

personally cashed in on such artificial inflation by unloading ***over 4.7 million shares*** of his

Company stock for total proceeds of ***over $328.5 million*** during the Relevant Period.  Plank's sales

were suspiciously timed, with a large portion of these sales—900,000 shares sold (*i.e.*, 18.9% of

total shares Plank sold during the Relevant Period) for total proceeds of approximately $38.3 million (*i.e.*, 11.7% of total proceeds from shares Plank sold during the Relevant Period)—occurring ***within just eight days*** after the Company raised guidance on April 21, 2016.

211.    Indeed, from July 29, 2014 through April 29, 2016, Defendant Plank sold 4,770,000 personally-held shares of Under Armour stock for total proceeds of approximately $328,516,281.31.  From July 28, 2014 to August 18, 2016, Defendant Coltharp sold 21,743 personally-held shares of Under Armour stock for total proceeds of approximately $1,112,440.39.  On April 25, 2016, Defendant Krongard sold 16,800 personally-held shares of Under Armour stock for total proceeds of approximately $762,849.36.   On August 11, 2014, Defendant Sippel sold 8,564 personally-held shares of Under Armour stock for total proceeds of approximately $590,573.44.   On April 25, 2016, Defendant Sanders sold 16,800 personally-held shares of Under Armour stock for total proceeds of approximately $760,859.40.  Finally, on November 5, 2015, Defendant Dickerson sold 10,000 personally-held shares of Under Armour stock for total proceeds of approximately $955,631.80.  The Insider Selling Defendants' sales are summarized in the following chart:

| Insider Selling Defendant | Date of Sales | Shares Sold | Average Share Price | Total Proceeds |
|---|---|---|---|---|
| Plank (CEO, Chairman of the Board, Founder) | 4/29/16 | 225,000 | $40.85 | $9,190,272.81 |
| | 4/28/16 | 225,000 | $42.57 | $9,577,540.94 |
| | 4/27/16 | 225,000 | $42.49 | $9,560,767.09 |
| | 4/26/16 | 225,000 | $44.15 | $9,933,750.00 |
| | 11/23/15 | 225,000 | $92.46 | $20,803,548.06 |
| | 11/20/15 | 225,000 | $91.52 | $20,591,157.32 |
| | 11/19/15 | 225,000 | $88.79 | $19,978,468.24 |
| | 11/18/15 | 225,000 | $86.00 | $19,349,538.50 |
| | 11/17/15 | 225,000 | $85.54 | $19,246,248.39 |
| | 4/29/15 | 123,750 | $78.99 | $9,774,810.75 |
| | 4/28/15 | 281,250 | $80.47 | $22,633,093.66 |
| | 2/10/15 | 123,750 | $73.12 | $9,048,600.00 |
| | 2/9/15 | 281,250 | $72.76 | $20,462,702.90 |
| | 10/31/14 | 123,750 | $65.62 | $8,120,936.17 |
| | 10/30/14 | 281,250 | $64.32 | $18,090,000.00 |
| | 10/29/14 | 281,250 | $64.06 | $18,016,875.00 |
| | 10/28/14 | 281,250 | $64.27 | $18,075,937.50 |
| | 8/1/14 | 123,750 | $67.15 | $8,309,273.56 |
| | 7/31/14 | 281,250 | $67.14 | $18,883,270.62 |
| | 7/30/14 | 281,250 | $69.06 | $19,423,125.00 |
| | 7/29/14 | 281,250 | $69.14 | $19,446,364.80 |
| **Total** | -- | 4,770,000 | $68.87 | $328,516,281.31 |
| Coltharp (Director) | 8/18/16 | 5,748 | $41.79 | $240,185.93 |
| | 8/17/16 | 7,595 | $38.34 | $291,226.46 |
| | 7/28/14 | 8,400 | $69.17 | $581,028.00 |
| **Total** | -- | 21,743 | $51.16 | $1,112,440.39 |
| Krongard (Director) | 4/25/16 | 16,800 | $45.41 | $762,849.36 |
| Sippel (Director) | 8/11/14 | 8,564 | $68.96 | $590,573.44 |
| Sanders (Director) | 4/25/16 | 16,800 | $45.29 | $760,859.40 |
| Dickerson (Former CFO, COO) | 11/5/15 | 10,000 | $95.56 | $955,631.80 |

| GRAND TOTAL | -- | 4,843,907 | $71.16 | $332,698,635.69 |
|---|---|---|---|---|

212.   In total, the Insider-Selling Defendants—all fully aware of the unlawful basis driving the Company's stock to highly artificially-inflated levels—sold a combined 4,920,605 shares of their personal holdings of Under Armour stock, at an average price of $71.16 per share, for total proceeds of $332,698,635.69 during the Relevant Period.  These insider sales were executed under highly suspicious circumstances, in that they occurred while the Company's stock price was artificially inflated due to the wrongful conduct and the false and misleading statements and omissions alleged herein.  Indeed, with Under Armour's Class A stock trading at $22.76 per share at close of trade on the day prior to the filing of this Complaint, the 4,920,605 shares sold by the Insider Selling Defendants during the Relevant Period would presently be worth only $110,247,323—i.e., $222,451,312 (or approximately 66%) less than they actually received from their unlawful sales.

213.   Moreover, a large portion of the Insider Selling Defendants' sales occurred within just days after the Company raised guidance on April 21, 2016.  Indeed, from April 26, 2016 through April 29, 2016, Defendant Plank sold 900,000 shares (i.e., 18.9% of the total shares sold by Plank during the Relevant Period) for total proceeds of approximately $38.3 million (i.e., 11.7% of the total proceeds from shares sold by Plank during the Relevant Period).  On April 25, 2016, Defendant Krongard sold 16,800 shares (i.e., 100% of the total shares sold by Krongard during the Relevant Period) for total proceeds of approximately $762,846.36 (i.e., 100% of the total proceeds from shares sold by Krongard during the Relevant Period).  Also on April 25, 2016, Defendant Sanders sold 16,800 shares (i.e., 50% of the total shares sold by Sanders during the Relevant Period) for total proceeds of approximately $760,859.40 (i.e., 44.3% of the total proceeds from

shares sold by Sanders during the Relevant Period).  In total, the 933,600 shares sold by Plank, Krongard, and Sanders, and the $39.8 million received from those sales, within mere days after the Company raised guidance on April 21, 2016, represent approximately 19% of the total shares sold and 11.8% of the total proceeds from such sales by all Insider Selling Defendants during the Relevant Period.

214.    Because of their roles as directors and/or officers of Under Armour during the Relevant Period, the Insider-Selling Defendants either knew, consciously disregarded, were reckless and grossly negligent in not knowing, or should have known material, adverse, non-public information about the business of Under Armour, including, inter alia, that the false and misleading statements and omissions alleged herein caused the price of the Company's stock to trade at artificially-inflated prices at the same time these Insider Selling Defendants were disposing of tens of millions of dollars' worth of Company stock.  These Insider Selling Defendants had a duty not to sell shares while in possession of material, adverse, non-public information concerning Under Armour's business model, future business and financial prospects, business practices, compliance policies, and internal controls, but they egregiously violated this duty.

## V.    DUTIES OF THE INDIVIDUAL DEFENDANTS

### A.    Fiduciary Duties

215.    By reason of their positions as officers, directors, and/or fiduciaries of Under Armour, and because of their ability to control the business and corporate affairs of Under Armour, the Individual Defendants owed, and owe, the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were, and are, required to use their utmost ability to control and manage Under Armour in a fair, just, honest, and equitable manner.  The Individual Defendants were, and are, required to act in furtherance of the best interests of Under Armour and

its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

216.    Each director and officer of the Company owed and owes to Under Armour and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing.

217.    In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's business model, future business and financial prospects, business practices, compliance policies, and internal controls so that the market price of the Company's stock would be based on truthful and accurate information.

### B.    Audit Committee Duties

218.    In addition to these duties, the members of the Audit Committee owed specific duties to Under Armour under the Audit Committee's Charter to review and approve quarterly and annual financial statements and earnings press releases, and to ensure that the Company had appropriate and effective internal controls over financial reporting.

219.    Specifically, according to Under Armour's Audit Committee Charter, the Audit Committee's responsibilities include the principal function of assisting the Board in fulfilling its oversight duties by overseeing:

1.    the quality and integrity of the Company's financial statements,

2.    the accounting and financial reporting process,

3.    the Company's systems of internal accounting and financial controls,

4.    those involved in the preparation and review of the financial statements,

5.      the performance of the Company's internal audit function and the independent

auditor, and

6.      the compliance by the Company with legal and regulatory requirements, including

the Company's disclosure controls and procedures.

220.    Specifically, regarding financial statements and disclosures, the members of the

Audit Committee owed specific duties to the Company under the Audit Committee Charter to:

- Review with the Chief Executive Officer and the Chief Financial Officer the Company's disclosure controls and procedures and review periodically, but in no event less frequently than quarterly, management's conclusions about the efficacy of such disclosure controls and procedures, including any significant deficiencies in, or material noncompliance with, such controls and procedures.

- Review with management, and obtain explanations as to whether:

    a.  actual financial results vary significantly from budgeted or projected results;

    b.  changes in financial ratios and relationships are consistent with changes in the operations and financing practices;

    c.  there are any significant or unusual events or transactions; and

    d.  the Company has complied with the terms of loan agreements or security indentures.

221.    Further, regarding internal controls, the members of the Audit Committee owed

specific duties to the Company under the Audit Committee Charter to:

- Evaluate whether management (i) is setting the appropriate tone for all employees by communicating the importance of internal control and (ii) is taking appropriate steps designed to ensure that employees possess an appropriate understanding of their roles and responsibilities with respect to internal control.

- Review with management and the independent auditors management's annual internal control report, including any attestation of it by the independent auditors. Management and the internal auditor shall report periodically to the Committee regarding any significant deficiencies in the design or operation of the Company's internal controls, material weaknesses in internal controls and any fraud (regardless of materiality) involving management or other persons

having a significant role in the internal controls, as well as any significant changes in internal controls implemented by management during the most recent reporting period of the Company.

- Discuss with the independent auditors and legal counsel instances of fraud, illegal acts, deficiencies in internal control, and related matters that have come to their attention.

- Gain an understanding of whether internal control recommendations made by internal and independent auditors have been implemented by management.

222.     Upon information and belief, the Company maintained an Audit Committee Charter during the Relevant Period that imposed the same, or substantially and materially the same or similar, duties on the members of the Audit Committee as those set forth above.

## C.    Duties Pursuant to the Company's Code of Conduct

223.     Additionally, the Individual Defendants, as directors and/or officers of Under Armour, were and are all bound by the Company's Code of Business Conduct (the "Code") which, according to the Code, requires all employees and directors, when "faced with a decision—big or small—[to] always do what you know is ethically right, and, of course, always follow the law." Each director, employee, agent, representative, and consultant of Under Armour is bound by the Code.

224.     The Code also imposed upon the Individual Defendants a duty to ensure the disclosure of accurate financial reports and records, providing as follows:

> We strive for fairness and accuracy in all our records and reports.  Teammates may not make any false statements, misleading entries or material omissions in any of Under Armour's books, financial records, personnel records and systems or other documents or communications.

> Since Under Armour's shares are publicly traded, we're obligated to make full, fair, timely, compliant, accurate and understandable disclosures to the public.

> All teammates responsible for the preparation of our public disclosures, or who provide information as part of that process, have a responsibility to ensure that these disclosures and information are complete, accurate and in compliance with our disclosure controls and procedures.

Make the right call.  If a supervisor asks you to record incomplete or inaccurate information into our books or records, you must report it to the highest level of management on your team, the Human Resources department, Global Ethics & Compliance or the hotline.

225.    The Code also strictly prohibited the Individual Defendants from engaging in insider selling, as follows:

While at Under Armour, you may come to possess material information – about Under Armour or other companies with which we do business – that is not available to the public.  "Material" information includes any information that a reasonable investor would consider important in deciding whether to buy, sell, or hold the securities involved, or any information that would, if disclosed to the public, likely affect the market price of the securities.  This can include both positive and negative information.   Some common examples include information about revenues, earnings or Under Armour's financial performance before that information becomes public, significant transactions such as mergers, acquisitions and divestitures, key personnel or management changes, and the development or discontinuation of significant products.  Information is generally considered public if the information has been spread through a press release, SEC filing, or other wide public distribution.

It is illegal for you to buy or sell stock or other securities of Under Armour or any company with which we do business while you are in possession of material nonpublic information.  It is also illegal for you to disclose such information to anyone else, including members of your immediate family or household, who might buy or sell securities in response to such information, or to suggest to anyone else that they buy or sell securities of the relevant company.

Any of the conduct discussed above can result in severe disciplinary action, up to and including termination of your employment, and subject both you and Under Armour to civil liability and criminal prosecution.

Under Armour's Insider Trading Policy also prohibits you from effecting short sales of Under Armour securities and from purchasing or selling derivative securities, such as puts and calls, relating to Under Armour stock.

226.    Upon information and belief, the Company maintained a version of the Code during the Relevant Period that imposed the same, or substantially and materially the same or similar, duties on the Individual Defendants as those set forth above.

### D.    **Control, Access, and Authority**

227.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Under Armour, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Under Armour.

228.    Because of their advisory, executive, managerial, and directorial positions with Under Armour, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of Under Armour.

229.    At all times relevant hereto, each of the Individual Defendants were the agent of each of the other Individual Defendants and of Under Armour, and were at all times acting within the course and scope of such agency.

### E.    **Reasonable and Prudent Supervision**

230.    To discharge their duties, the Individual Defendants, as directors and officers of Under Armour, were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the Individual Defendants, as officers and directors of Under Armour, were required to, among other things:

(a)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     properly and accurately guide shareholders and analysts as to the true financial and business prospects of the Company at any given time, including making accurate statements about the Company's business and financial prospects and internal controls;

(d)     remain informed as to how Under Armour conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(e)     ensure that Under Armour was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

## VI.     BREACHES OF DUTIES

231.    Each Individual Defendant, by virtue of their position as a director and/or officer, owed to Under Armour and its shareholders the fiduciary duties of loyalty and good faith, and the exercise of due care and diligence in the management and administration of the affairs of Under Armour, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Under Armour, the absence of good faith on their part, and a reckless disregard for their duties to Under Armour and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to Under Armour.

232.    The Individual Defendants each breached their duties of loyalty and good faith by allowing the other Individual Defendants to deceive, or by themselves deceiving, the investing public, and artificially inflating and maintaining the market price of Under Armour's securities by

making, or causing to be made, false and misleading statements and omissions about the Company's business model, future business and financial prospects, business practices, compliance policies, and internal controls, as well as by engaging in unlawful insider sales.

233.     The Individual Defendants also violated, or failed to prevent others from violating, federal securities laws, which have resulted in, and exposed the Company to, the Securities Class Action.  As a result of these and other breaches of fiduciary duties, Under Armour has expended, and will continue to expend, significant sums of money to rectify the Individual Defendants' wrongdoing.

234.     Thus, the Individual Defendants, because of their positions of control and authority as directors and/or officers of Under Armour, were able to, and did, directly, and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company, which resulted in substantial harm to Under Armour.

235.     Specifically, as members of the Audit Committee, Defendants Coltharp and Krongard (Chair) breached their fiduciary duties of good faith and loyalty by, *inter alia*, failing to implement sufficient internal controls and procedures and/or recklessly and indifferently failing to follow internal controls and procedures to ensure the accuracy of the Company's public statements. Because of this failure, the Company issued false and misleading statements concerning the Company's business model, future business and financial prospects, business practices, compliance policies, and internal controls, as alleged herein.

## VII.     CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

236.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with,

and conspired with, one another in furtherance of their wrongdoing.  The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

237.    During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to mislead shareholders into believing that the Company's business model, future business and financial prospects, business practices, compliance policies, and internal controls were better than they actually were.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

238.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (a) disguise the Individual Defendants' violations of law, including breaches of fiduciary duties and unjust enrichment; and (b) disguise and misrepresent the Company's actual business model, future business and financial prospects, business practices, compliance policies, and internal controls.

239.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or negligently release improper statements.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

240.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Individual Defendant acted with

knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of their overall contribution to and furtherance of the wrongdoing.

## VIII.   DAMAGES TO UNDER ARMOUR

241.    As a result of the Individual Defendants' wrongful conduct, Under Armour disseminated false and misleading statements, and omitted material information to make such statements not false and misleading when made, in evident violation of federal and state laws and regulations.  This misconduct has devastated Under Armour's credibility.  Further, Under Armour is the subject of the Securities Class Action.  Under Armour has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

242.    As a direct and proximate result of the Individual Defendants' actions as alleged above, Under Armour's market capitalization has been substantially damaged, having lost billions of dollars in value as a result of the conduct described herein.

243.    Further, as a direct and proximate result of the Individual Defendants' conduct, Under Armour has expended, and will continue to expend, significant sums of money.  Such expenditures include, but are not limited to:

   (a)    costs incurred in investigating and defending Under Armour and certain of its officers and directors (*i.e.*, the Individual Defendants) in the pending Securities Class Action, plus potentially tens of millions of dollars in settlement or to satisfy an adverse judgment;

   (b)    costs incurred from the misappropriation of Company information by the Insider-Selling Defendants for the purpose of selling Under Armour common stock at artificially-inflated prices;

(c)     costs incurred from compensation and benefits paid to the Individual Defendants, which compensation was based at least in part on Under Armour's artificially-inflated stock price; and

(d)     costs incurred from the loss of the Company's customers' confidence in Under Armour's products.

244.    Moreover, these actions have irreparably damaged Under Armour's corporate image and goodwill.  For at least the foreseeable future, Under Armour will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Under Armour's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## IX.    DERIVATIVE AND DEMAND ALLEGATIONS

245.    Plaintiffs bring this action derivatively, in the right and for the benefit of Under Armour, to redress injuries suffered, and to be suffered, by Under Armour as a direct result of the Individual Defendants' breaches of fiduciary duties and other violations of law.  Under Armour is named as a nominal defendant solely in a derivative capacity.

246.    Plaintiffs will adequately and fairly represent the interests of Under Armour in enforcing and prosecuting its rights.

247.    Plaintiffs are, and have continuously been, shareholders of Under Armour since prior to the start of the Relevant Period, and have been shareholders at all relevant times, including at the time of the Individual Defendants' wrongdoing complained of herein.

248.    As detailed below, Plaintiffs' pre-suit demand has been refused by the Board, forcing Plaintiffs to file this shareholder derivative action, and this Complaint, on behalf of the Company.

249.     Given the Board's wrongful, bad-faith, and unreasonable refusal of Plaintiffs' lawful demand to sufficiently investigate the misconduct, and/or to take sufficient action to remedy the harms caused to the Company, this shareholder derivative action should be permitted to proceed.

A.     **Plaintiffs' Demand Allegations**

250.     Before filing this derivative action, Plaintiffs first demanded that the Board take action to investigate and redress the misconduct alleged herein.  Specifically, on July 5, 2017, in accordance with Maryland law, Plaintiffs issued the Demand on the Board to investigate, and if warranted, commence legal action against certain of the Company's current and former directors and executive officers who violated and caused the Company to violate the federal securities laws and Maryland law, *inter alia*, and who accordingly caused the damages the Company has suffered in connection with the events underlying the Securities Class Action.  A true and correct copy of the Demand is attached hereto as **Exhibit A**.

251.     In response to Demand, Plaintiffs' counsel received a letter dated July 14, 2017, (the "July 14 Letter"), from James D. Wareham of the law firm FFHSJ, who signed the July 14 Letter on behalf of the Company.  The July 14 Letter acknowledged the Board's receipt of the Demand and stated that "[o]nce the board has determined the appropriate course of action, we will contact you promptly."  A true and correct copy of the July 14 Letter is attached hereto as **Exhibit B**.

252.     Plaintiffs' counsel then received another letter dated August 15, 2017 (the "August 15 Letter") from Xiao Wang of the law firm Williams & Connolly LLP, on behalf of "a group of directors who are reviewing your demand."  The August 15 Letter requested documentation of Plaintiffs contemporaneous and continuous ownership of Under Armour stock,

and "offered" Plaintiffs the opportunity to submit additional information that they would like the directors to consider.   A true and correct copy of the August 15 Letter is attached hereto as **Exhibit C**.

253.   On August 23, 2017, Plaintiffs' counsel responded to Mr. Wang by letter (the "August 23 Letter"), raising several issues with the August 15 Letter.   For example, Plaintiffs' counsel noted, *inter alia*, that the August 15 Letter failed to identify the identity of the specific individuals who would review the Demand, whether or not they were affiliated with the Company, the scope of their mandate in connection with reviewing the Demand, and details as to how they were selected and determined to be disinterested and independent.   Plaintiffs' counsel also requested details concerning the involvement of Mr. Wang's firm, such as when it was retained as counsel to the group of directors who were "reviewing" the Demand, as well as how, when, and by whom Mr. Wang's firm was determined to be independent.   Additionally, in order to facilitate the efficient conduct of the Company's "review" of the Demand, Plaintiffs' counsel welcomed the opportunity to be briefed by the person(s) conducting the "review" regarding the current status of such "review," what remained to be done, and the work plan for doing so.   Finally, Plaintiffs' counsel offered to provide documentation of Plaintiffs' contemporaneous and continuous ownership of Under Armour stock.   A true and correct copy of the August 23 Letter is attached hereto as **Exhibit D**.

254.   On August 25, 2017, Plaintiffs' counsel received an email from Mr. Wang acknowledging receipt of the August 23 Letter and noting only that it had been referred to the Company and its legal counsel ("August 25 E-Mail").   A true and correct copy of the August 25 E-Mail is attached hereto as **Exhibit E**.

255.    Thereafter, Plaintiffs' counsel received no explanation for or response to any of the key issues raised in the August 23 Letter, and in fact received no further communication for nearly three months, until November 10, 2017.  On that date, Plaintiffs' counsel finally received a letter (the "November 10 Refusal") from Mr. Wareham, on behalf of the Company.  Without resolving any of the issues raised by Plaintiffs' counsel in the August 23 Letter, the November 10 Refusal summarily claimed that a purportedly independent and disinterested group of directors, together with purportedly independent outside counsel, had completed an investigation into the Demand and issued a final report (the "Report") to the Board, a copy of which was attached to the November 10 Refusal.  The November 10 Refusal also stated that "[t]he review group (i) found no evidence supporting the allegations set forth in [the Demand,] and (ii) recommended that the Board decline to pursue claims against those whom you identified," and noted that a majority of purportedly disinterested and independent directors voted to adopt such findings and recommendations at a meeting held November 6, 2017.   A true and correct copy of the November 10 Refusal is attached hereto as **Exhibit F**.

256.    On December 7, Plaintiffs' counsel sent Mr. Wareham letter (the "December 7 Letter"), highlighting and explaining in detail the numerous issues raised and illustrated by, and remaining following, receipt the November 10 Refusal.  Specifically, the December 7 Letter explained—and quoted language from the Demand to the effect—that the Demand explicitly required the Company to consider and investigate the allegations detailed in the Securities Complaint.  However, as Plaintiffs' counsel stated in the December 7 Letter,

> After reviewing the Report, it is evident that the Review Group did not consider or address, among other things, many of the critical allegations set forth in the [Corrected] Consolidated Amended Complaint for Violations of the Federal Securities Law ("CCAC"), filed in *In re Under Armour Securities Litigation*, No. 1:17-cv-00388-RDB (D. Md.) (the "Federal Securities Class Action").

The December 7 Letter attached a copy of the Securities Complaint and, to leave no doubt as to the specific allegations therefrom that the Review Group should have considered (but evidently did not), Plaintiffs' counsel also included a description of dozens of specific examples of allegations from the Securities Complaint, including citations thereto.  The December 7 Letter concluded by requesting as follows:

> Please confirm, as soon as possible but no later than ten (10) days from the date of this letter, whether the Review Group and/or the Board actually considered the above, or any allegations set forth in the CCAC. If the Review Group and/or the Board contends that the allegations set forth in the CCAC were reviewed and investigated by the Review Group, please (i) identify the specific allegations considered by it; (ii) whether the Review Group stands by its recommendation to refuse the Demand Letter; and (iii) whether the Board stands by its decision to adopt the findings and recommendations of Review Group and still refuses to pursue claims against the Company's Directors and Officers based on, and/or arising out of, those allegations. If the Review Group and/or the Board concedes that it did not review and investigate the allegations set forth in the CCAC, please confirm whether, how, and by when it will do so.

A true and correct copy of the December 7 Letter is attached hereto as **Exhibit G**.

257.    Plaintiffs' counsel received a response from Mr. Wareham by letter dated December 15, 2017 (the "December 15 Letter").  The December 15 Letter noted only that the Plaintiffs' December 7 Letter had been delivered to the Board and Review Group, represented that "[t]he board takes letters of this type extremely seriously," and ensured that "[o]nce the board has determined the appropriate course of action, we will contact you promptly."  A true and correct copy of the December 15 Letter is attached hereto as **Exhibit H**.

258.    On January 11, 2018, after over a month had passed since Plaintiffs delivered the December 7 Letter, Plaintiffs' counsel sent Mr. Wareham another letter (the "January 11 Letter"). The January 11 Letter acknowledged receipt of the December 15, 2017 Letter, and noted that the Company's response contained therein "is alarming considering review of such allegations in the CCAC should have been part of the Review Group's work in connection with the Demand."

Nevertheless, the January 11 Letter reiterated the issues described, and demanded the same confirmation and/or action as, in the December 7 Letter.  A true and correct copy of the January 11 Letter is attached hereto as **Exhibit I**.

259.    Then, on February 23, 2018, after *over two months* had elapsed since Plaintiffs delivered the December 7 Letter, and over a month after Plaintiffs delivered the January 11 Letter, Plaintiffs' counsel finally received a response from Mr. Wareham, on behalf of the Company (the "February 23 Refusal").  Once again, without resolving any of the issues raised by Plaintiffs' counsel in Plaintiffs' December 7 Letter and/or January 11 Letter, the February 23 Refusal summarily claimed that the Board and Review Group "have considered your letters," that the Review Group "has reaffirmed" the Report and its prior recommendation to the Board, and that the Board "has reaffirmed its November 6, 2017 determination that it is not in the best interests of the Company or its stockholders to pursue the claims alleged in your [D]emand."  Rather than addressing *any* of the specific allegations of the Securities Complaint that Plaintiffs' December 7 Letter and January 11 Letter explained the Board was required to have considered pursuant to Plaintiffs' Demand, the February 23 Refusal responded only that "the Company's position is that there is no merit to the allegations in the [Securities Complaint]."  A true and correct copy of the February 23 Refusal is attached hereto as **Exhibit J**.

260.    The Board and the Review Group failed to act independently, in good faith, and within the realm of sound business judgment when it decided to deny the Demand.

261.    *First*, the Board has treated the Company's and the Individual Defendants' interests as fully aligned in responding to the Demand.  As a result, the Board's refusal of the Demand was the product of a woefully inadequate and conflicted process.  The Demand sought relief on behalf of Under Armour, the victim whose rights and injuries the Demand sought to redress, against the

Individual Defendants.  In derivative suits against corporate directors, the directors have an interest in minimizing any recovery, while the corporation wants to maximize the recovery.  As such, in the context of investigating and responding to the Demand, Under Armour's interests and the Individual Defendants' interests were adverse.

262.     The Board's response to the Demand was unreasonable and not a valid exercise of business judgment.  From the very beginning of its response to the Demand, the Board employed FFHSJ, counsel for both the Company and the Individual Defendants.  *See* July 14 Letter from FFHSJ (Exhibit B hereto) ("Once the board has determined the appropriate course of action, **_we_** will contact you promptly.") (emphasis added).   Under Maryland law, representation of a corporation as an entity and the majority of its directors creates a conflict of interest for the attorney where, as here in connection with the matters raised in the Demand, the corporation's interests are adverse to those of the directors.  FFHSJ's representation of both the Company and the Board in connection with the matters raised in the Demand is evident from the Board's responses to the Demand.  *See* July 4 Letter (Exhibit B hereto); November 10 Refusal (Exhibit F hereto); December 15 Letter (Exhibit H hereto); February 23 Refusal (Exhibit J hereto).  The Company only nominally recognized, at best, the Company's and the Board's adverse positions by having the Review Group purportedly retain the law firm Williams & Connolly LLP ("W&C") as counsel to purportedly assist in investigating the issues raised in the Demand.

263.     Thus, the Board engaged counsel to respond to the Demand that was unable to, on the one hand, zealously defend the Company and the Individual Securities Class Action Defendants in the Securities Class Action, while on the other hand simultaneously investigate and independently recommend whether to prosecute claims against the same Individual Securities Class Action Defendants on behalf of the Company in response to the Demand.  The Demand

correspondence demonstrates this conflict.  The December 7 Letter identified allegations from the [Corrected] Consolidated Amended Complaint for Violations of the Federal Securities Law ("CCAC") filed in the Securities Class Action on August 9, 2017.  *See* December 7 Letter (Exhibit G hereto) at pp. 2-5.  Rather than fully investigate the specific matters raised in the December 7, 2017 letter that were not addressed in the October 25, 2017 report, the Review Group, through FFHSJ, merely "reaffirmed its October 25, 2017 report" and referenced the motion to dismiss filed in the Securities Class Action in support of "the Company's position that there is no merit to the allegations in the plaintiffs' Consolidated Amended Complaint for Violations of the Federal Securities Laws ["Motion to Dismiss"]."  Of course, any other conclusion would have required FFHSJ to directly contradict the arguments raised in the Motion to Dismiss filed by FFHSJ in the Securities Class Action.

264.    Other conflicts further foretold the foregone conclusion that the Review Group and the Board would refuse to pursue the relief requested in the Demand.  The Board is beholden to Plank, the Company's largest shareholder, who beneficially owns approximately 15% of all shares outstanding and controlling approximately 65% of the voting shares.  Since Under Armour's inception in 1996, and even after it went public in 2005, Plank has called the shots, always controlling a majority of stockholder votes and serving as CEO and Chairman of the Board.  As controlling stockholder of the Company, Plank also controls the annual election of these individuals to the Board.

265.    Indeed, Plank has a history of dominating the Board.  As a recent example, in 2015, a shareholder derivative and class action was filed captioned *In re: Under Armour S'holder Litig.*, Case No. 24-C-15-003240 (Md. Cir. Ct. Balt. City) (the "Prior Under Armour Action").  The Prior Under Armour Action arose in connection with the decisions of the Board to establish the

Company's Class C Common Stock and declare and pay a dividend of one share of Class C Common Stock for each outstanding share of the Company's one-vote-per-share Class A Common Stock and ten-votes-per-share Class B Common Stock (the "Class C Stock Issuance"). The plaintiffs in the Prior Under Armour Action contended that Under Armour, Plank, and members of the Board breached their fiduciary duties in formulating and/or approving the Class C Common Stock Issuance and certain amendments to the Company's charter in connection therewith, which the plaintiffs alleged were intended to and did entrench Plank, who held 100% of the super-voting Class B Common Stock. The plaintiffs further alleged that the Class C Stock Issuance would likely cause the public Class A stockholders to lose part of the value of their Under Armour holdings because half their holdings would be converted into non-voting Class C Stock that would likely trade at a discount to the one-vote-per-share Class A Stock, whereas the overwhelming majority of Plank's holdings were in super-voting Class B Stock, which would continue to control Under Armour and not have its value reduced. After conducting document review and taking the deposition of Krongard, the plaintiffs in the Prior Under Armour Action obtained a settlement providing that holders of Class C Common Stock would receive an adjustment payment of $59 million to compensate them for this potential loss of value. According to experts retained by the plaintiffs in the Prior Under Armour Action, the adjustment payment represented a direct economic transfer valued at approximately $4.9 million from Plank to the class. Moreover, the settlement also included significant corporate governance reforms.

266.    In addition, Olson has concurrently served with Krongard on the board of another publicly-traded company, and Krongard recommended Olson's appointment to the Board, casting doubt as to whether Olson could impartially investigate whether Krongard committed the wrongdoing complained of herein. In addition, Bodenheimer, a former executive at the sports

entertainment company ESPN, Inc. ("ESPN"), currently serves along with Plank as a member of the board of directors of the V Foundation for Cancer Research (the "V Foundation"), a charitable organization co-founded by ESPN.  Accordingly, Bodenheimer's affiliations with Plank casts doubt as to whether Bodenheimer could independently determine whether Plank breached his fiduciary duties and committed other violations of law.

267.  A majority of the Directors who voted to adopt the Review Group's recommendation and to refuse Plaintiffs' Demand also made, certified, and/or approved the precise false and misleading public statements asserted in Plaintiffs' Demand.  Additionally, a majority of the Directors participated in unlawful insider trading by selling millions of dollars of Under Armour stock based on knowledge of the material, non-public information asserted in Plaintiffs' Demand.

268.  *Second*, the Review Group failed to (i) properly identify the claims at issue, (ii) failed to review the testimony of or interview responsible directors, officers, and employees, and (iii) failed to review documents regarding the questionable transactions identified in the Demand.

269.  The Board's response failed to even address, much less confirm, that any investigation was actually conducted into the centerpiece of the Demand—to wit, whether the Company's statements were false and misleading when made.  The Review Group failed to meaningfully investigate or address numerous critical components of the actual Demand made by Plaintiffs including, *inter alia*, the accuracy of the Individual Defendants' myriad public statements alleged to be false and misleading in the Securities Complaint (as explicitly incorporated by the Demand), the Individual Defendants' alleged breaches of their fiduciary duties to the Company, and their alleged unlawful insider sales.

270.     In addition, the Review Group inexplicably failed to interview numerous current and former Directors expressly identified in the Demand as responsible for the wrongdoing alleged therein, including Individual Defendants Coltharp, Katz, and former Director Sippel.  The limited scope of the review is further indication that the Review Group's investigation was not reasonable and lacked good faith.

271.     In light of the Board's unreasonable and wrongful refusals of Plaintiffs' Demand to investigate and remediate harms caused to the Company, Plaintiffs have filed this action alleging violations of Section 14(a) of the Exchange Act, breach of fiduciary duties, insider trading, and unjust enrichment.

272.     The Board has failed on every level in response to each of the Plaintiffs' respective pre-suit demands.  The Board failed to meaningfully investigate or even address the accuracy of the Company's public disclosures, failed to engage in a meaningful and transparent process, reached inexplicable conclusions, and failed to undertake any investigation whatsoever of the actual demands made.  As such, the Board's response to the Demand was improper and directly at odds with the Board's fiduciary duties.  Accordingly, this derivative action should proceed.

273.     The Board's failure to conduct a bona-fide and independent investigation into the allegations raised in the Demand regarding the Company's disclosure issues, along with its complete disregard of the actual merits of the claims set forth in the Demand and prejudgment of the merits of the claims set forth in the Demand, is improper and demonstrates the Board's lack of diligence and good faith.  The entire "process" was procedurally deficient and replete with conflicts of interest.  The Board's abdication of its duty to investigate the centerpiece of the Demand (the accuracy of the Company's public disclosures, which ultimately resulted in the sustained Securities Class Action) was not reasonable, was a decision made in bad faith, and is not

entitled to the protections of the business judgment rule and likewise warrants that this action proceed.

## X.      CAUSES OF ACTION

### COUNT I
### Breach of Fiduciary Duties for Disseminating False and Misleading Information to Shareholders (Individual Defendants

274.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

275.     As alleged in detail herein, each of the Individual Defendants owed, and owe, Under Armour and its shareholders fiduciary obligations, including the duties of care, loyalty, good faith, fair dealing, independence, oversight, and supervision.  These duties include the duty of full and fair disclosure to shareholders, also known as the duty of candor.  To execute this duty, the Individual Defendants were required to disseminate accurate, truthful, and complete information to shareholders at all times.

276.     In direct violation of these duties, the Individual Defendants each knowingly or recklessly issued, or approved the issuance of, false public statements to shareholders that misrepresented and/or failed to disclose material information concerning the Company's business model, future business and financial prospects, business practices, compliance policies, and internal controls.  Specifically, the Individual Defendants made, or caused the Company to make, the false and/or misleading statements identified above in ¶207.  As a result of their fraudulent scheme, the Individual Defendants were able to artificially inflate the Company's financials, and its stock price, throughout the Relevant Period.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the best interests of the Company and its shareholders.

277.    As a direct and proximate result of the Individual Defendants' failure to perform these fiduciary obligations, Under Armour has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

278.    Plaintiffs, on behalf of Under Armour, have no adequate remedy at law.

## COUNT II
## Breach of Fiduciary Duties for Failure to Maintain Internal Controls
### (Individual Defendants)

279.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

280.    As alleged in detail herein, each of the Individual Defendants had a duty to exercise good faith in order to ensure that the Company maintained adequate internal controls.  When put on notice of problems with Under Armour's business model, future business and financial prospects, business practices, compliance policies, and internal controls, each Individual Defendant was required to exercise good faith in taking appropriate action to correct the misconduct and to prevent its recurrence.

281.    In direct violation of these duties, the Individual Defendants willfully ignored the obvious and pervasive problems with Under Armour's internal control practices and procedures and failed to make a good faith effort to correct the problems or their recurrence.  As directors and/or officers of Under Armour, the Individual Defendants were responsible for the authorizing of, or the failure to monitor, the business practices which resulted in violations of the law as alleged herein.  Each of the Individual Defendants had knowledge of and actively participated in, approved of, or acquiesced in the wrongdoings alleged herein.

282.    As a direct and proximate result of the Individual Defendants' failure to perform these fiduciary obligations, Under Armour has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

283.     Plaintiffs, on behalf of Under Armour, have no adequate remedy at law.

## COUNT III
### Breach of Fiduciary Duties for Failure to Oversee and Manage the Company
### (Individual Defendants)

284.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

285.     As alleged in detail herein, each of the Individual Defendants had a duty to exercise prudent oversight and supervision of Company officers and other employees to ensure that they conducted Under Armour's affairs in conformity with all applicable laws and regulations.

286.     In direct violation of these duties, the Individual Defendants turned a blind eye to their duties of oversight and supervision, and willfully or in bad faith, allowed Company officers or other employees to conduct the Company's operations in violation of applicable laws and regulations, and in a manner that grievously harmed the best interests of the Company and its shareholders, rather than protecting those interests.

287.     The Individual Defendants each knowingly, recklessly, or negligently: (i) made or caused to be made false and misleading statements that misrepresented or failed to disclose material information concerning the Company; (ii) approved the issuance of such false and/or misleading statements; (iii) failed to take actions to correct such false and/or misleading statements after they had been disseminated by the Company; (iv) failed to act independently and with due care in rejecting Plaintiffs' Demand; and/or (v) failed to address the misconduct alleged herein. These actions were not a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

288.     As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Under Armour has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

289.     Plaintiffs, on behalf of Under Armour, have no adequate remedy at law.

## COUNT IV
### Breach of Fiduciary Duties for Insider Selling and Misappropriation of Company Information (Insider Selling Defendants)

290.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

291.     At the time the Insider Selling Defendants sold their Under Armour stock, they were in possession of material, adverse, non-public information concerning the Company, and they sold their stock on the basis of that information.

292.     The material, adverse, non-public information at issue—which concerned the Company's business model, future business and financial prospects, business practices, compliance policies, and the sufficiency of its internal controls—was a proprietary asset belonging to the Company that must be used to benefit the Company and all its shareholders on equal terms. Instead, the Insider Selling Defendants misappropriated this information entirely for their own benefit.

293.     At the time of their stock sales, the Insider Selling Defendants knew the truth about the Company's falsely and/or misleadingly reported business model, future business and financial prospects, business practices, artificially inflated financials and stock price, lack of compliance policies, and faulty internal controls.

294.     The Insider-Selling Defendants' sales of stock while in possession and control of this material, adverse, non-public information was a breach of their fiduciary duties of loyalty and good faith.

295.     Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to

the imposition of a constructive trust on any profits that the Insider Selling Defendants obtained thereby.

296.    As a direct and proximate result of these Insider Selling Defendants' breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

297.    Plaintiffs, on behalf of Under Armour, have no adequate remedy at law.

**COUNT V**
**Unjust Enrichment (Individual Defendants)**

298.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

299.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Under Armour.

300.    The Individual Defendants were unjustly enriched as a result of the compensation they received while breaching their fiduciary duties owed to Under Armour.

301.    Plaintiffs, as shareholders and representatives of Under Armour, seek restitution from the Individual Defendants and seek an order from this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants from their wrongful conduct and fiduciary breaches.

302.    As a direct and proximate result of these Defendants' misconduct, the Company has suffered significant damages, as alleged herein.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

303.    Plaintiffs, on behalf of Under Armour, have no adequate remedy at law.

**XI.    PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment as follows:

- 108 -

A.     Against all Individual Defendants for the amount of damages sustained by the Company as a result of the Individual Defendants' violations of federal law, breaches of fiduciary duties, and unjust enrichment;

B.     Directing Under Armour to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws, and to protect Under Armour and its shareholders from a repeat of the damaging events described herein, including but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation, and taking such other action as may be necessary to place before shareholders for a vote the following corporate governance proposals or policies:

- a proposal to strengthen the Board's supervision of operations and compliance with applicable state and federal laws and regulations;

- a proposal to strengthen the Company's internal reporting and financial disclosure controls;

- a proposal to develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

- a proposal to ensure the accuracy of the qualifications of Under Armour's directors, executives, and other employees;

- a provision to strengthen the Company's oversight and controls over insiders' purchase and sale of Company stock;

- a proposal to regulate the Board's future authorizations and/or approvals of bond issuances;

- a proposal to require an independent Chairman of the Board;

- a provision to permit shareholders of Under Armour to nominate at least three candidates for election to the Board to replace existing directors;

- a proposal to strengthen the Company's procedures for the receipt, retention, and treatment of complaints received by the Company regarding internal controls;

- a provision to appropriately test and then strengthen the Company's internal operational control functions; and

C.     Awarding to Under Armour restitution from the Individual Defendants, and ordering disgorgement of all profits, benefits, and other compensation obtained by the Individual Defendants;

D.     Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.     Granting such other and further relief as the Court deems just and proper.

## XII.   JURY DEMAND

Plaintiffs demand a trial by jury.

Respectfully submitted,

**BROWN GOLDSTEIN LEVY, LLP**

_____/s/_____

Joseph B. Espo, Federal Bar No. 07490
Dana W. McKee, Federal Bar No. 04447
120 E. Baltimore Street, Suite 1700
Baltimore, MD  21202
Telephone: (410) 962-1030
Facsimile: (410) 385-0869
jbe@brownhold.com
dwm@browngold.com

**JOHNSON FISTEL, LLP**

Michael I. Fistel, Jr. (*pro hac vice to be filed*)
michaelf@johnsonfistel.com
William W. Stone (*pro hac vice to be filed*)
williams@johnsonfistel.com
David A. Weisz (*pro hac vice to be filed*)
davidw@johnsonfistel.com
Murray House
40 Powder Springs Street
Marietta, GA 30064
Telephone: (470) 632-6000
Facsimile: (770) 200-3101

*Attorneys for Plaintiffs*

Dated:  July 23, 2018

# **VERIFICATION**

I, Brock Andersen, verify that I have reviewed the foregoing Verified Shareholder Derivative Complaint, and that the allegations as to me are true and correct and that the other allegations upon information and belief are true and correct.

Dated:  July 20 , 2018

DocuSigned by:

*Brock Andersen*

CB72815B3E72433...

(Signature of Brock Andersen)

DocuSign Envelope ID: 9CF79A16-2B77-4A8E-8329-C141724892B7

# **VERIFICATION**

I, Balraj Paul, verify that I have reviewed the foregoing Verified Shareholder Derivative Complaint, and that the allegations as to me are true and correct and that the other allegations upon information and belief are true and correct.

Dated:  July <u>16</u>, 2018

DocuSigned by:

*Balraj Paul*
_____
1AC0B6E338764B9...

(Signature of Balraj Paul)